**No. 25-4833**

# In the United States Court of Appeals for the Ninth Circuit

SAZERAC COMPANY, INC.,

*Appellant*,

v.

TERRY MYERS AND DAWN OUTLAW,

*Appellees*.

On Appeal from the United States District Court
for the Northern District of California
Civil No. 3:23-CV-522-EMC
The Honorable Edward M. Chen

**BRIEF AMICUS CURIAE OF INTERNATIONAL ASSOCIATION OF DEFENSE COUNSEL IN SUPPORT OF APPELLANT SAZERAC COMPANY, INC. AND REVERSAL**

Aaron D. Van Oort
Tyler A. Young
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000
Aaron.VanOort@FaegreDrinker.com
Tyler.Young@FaegreDrinker.com

E. Paul Cauley, Jr.
FAEGRE DRINKER BIDDLE & REATH LLP
2323 Ross Avenue
Suite 1700
Dallas, TX 75201
(469) 357-2503
Paul.Cauley@FaegreDrinker.com

Teresa Akkara
FAEGRE DRINKER BIDDLE & REATH LLP
1144 15th Street
Suite 3400
Denver, CO 80202
(303) 607-3539
Teresa.Akkara@FaegreDrinker.com

*Counsel for Amicus International Association of Defense Counsel.*

# TABLE OF CONTENTS

**Page**


Table of Authorities ........ iii

Identity and Interest of Amicus ........ 1

Introduction ........ 2

Argument ........ 4

- A. Market Prices Are Set By The Interaction Of Supply And Demand, So Estimating A Change In Price Requires Considering Both Of Them. ........ 4
- B. Conjoint Analyses Assess Only Demand, Not Supply. ........ 6
- C. Plaintiffs' Experts Err In How They Address Supply: They Irrationally Keep It Constant. ........ 8
- D. This Court Should Join Those That Have Rejected Damages Analyses That Irrationally Keep Supply Constant, Contrary To Market Realities ........ 13

Conclusion ........ 15

Certificate of Compliance ........ 16

Certificate of Service ........ 17

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008) .......... 12

*In re General Motors LLC Ignition Switch Litig.*,
407 F. Supp. 3d 212 (S.D.N.Y. 2019) .......... 4, 13

*In re NJOY Consumer Class Action Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015) .......... 5, 9

*In re NJOY, Inc. Consumer Class Action Litig.*,
2016 WL 787415 (C.D. Cal. Feb. 2, 2016) .......... 4, 6, 9, 14

*Saavedra v. Eli Lilly & Co.*,
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .......... 7, 14

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*,
500 F. Supp. 3d 940 (N.D. Cal. 2020) .......... 9, 13

*Zakaria v. Gerber Prod. Co.*,
755 F. App'x 623 (9th Cir. 2018) .......... 3, 12, 14, 15

**Other Authorities**

Bryan Orne, *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research* 26–27 (4th ed. 2019) .......... 7

Greg Allenby et al., *Computing Damages in Product Mislabeling Cases: Plaintiffs' Mistaken Approach in* Briseno v. ConAgra*,* 45 Prod. Safety & Liab. Rep. 208 (Feb. 27, 2017) (as reprinted by Bloomberg Law, at 3) .......... 10

Greg M. Allenby et al., *Economic Valuation of Product Features*, 12 Quantitative Marketing and Economics 421, 455 (2014) .......... 8

Jeffrey Church & Roger Ware, *Industrial Organization: A Strategic Approach* 23 (Irwin McGraw-Hill 2000) .......... 11

John Hauser, *Note on Conjoint Analysis* 16 (MIT Sloan Courseware Fall 2015), https://ocw.mit.edu/courses/15-810-marketing-management-analytics-frameworks-and-applications-fall-2015/resources/mit15_810f15_conjoint/ .......... 8

Lisa Cameron et al., *Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations,* in *Product Liability, 20th ed.*, *International Comparative Legal Guides* 23, 26 (Adela Williams & Tom Fox eds. 2022) .......... 11

Rene Befurt et al., *Supply Side Considerations When Using Conjoint Analysis in Litigation*, in *Handbook of Marketing Analytics: Methods and Applications in Marketing, Public Policy, and Litigation* 2 (Natalie Mizik & Dominique Hanssens eds. 2024), https://mitsloan.mit.edu/shared/ods/documents?PublicationDocumentID=10240 .......... 7, 12

## IDENTITY AND INTEREST OF AMICUS

The International Association of Defense Counsel (IADC) has been serving a distinguished membership of corporate and insurance defense attorneys and insurance executives since 1920. Its activities benefit the approximately 2,500 invitation-only, peer-reviewed members and their clients, as well as the civil justice system and the legal profession. The IADC also takes a leadership role in many areas of legal reform and professional development. The IADC and its members have interest in the sound development of class action law. All parties to this case have consented to the filing of this brief.[1]

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amicus curiae states that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than amicus curiae, its members, or its counsel contributed money intended to fund the preparation or submission of this brief.

## INTRODUCTION

This case presents an example of a pervasive problem in class litigation and provides the Court with the opportunity to solve it. The problem is a type of unreliable damages analysis that uses irrational assumptions to exaggerate price premiums, and the solution is to identify the error and refuse to certify classes based on analyses that make it.

In this case, as in most consumer class actions alleging false or deceptive marketing, the Plaintiffs claim that if the false or deceptive marketing claim were removed, the product's market price would drop. The amount of this drop—the "price premium" associated with the false or deceptive claim—is what the Plaintiffs claim for damages. Plaintiffs' incentive is to exaggerate the estimated price change so as to maximize their damages. And they do so by conducting an artificial analysis that is unreliable as a matter of law.

Specifically, they assume that if consumer demand for a product were to drop, the producer would nonetheless insist on making exactly the same number of sales—no matter how low it had to drop the price to do so, and no matter how much money it lost in the process. This is an irrational assumption. It has no support in economic theory. It has no support in reality. Plaintiffs make the assumption only because it results in wrongly predicting that huge price drops would follow from minor advertising changes, and it therefore allows them to claim huge damages.

Many economists and courts have seen through the error and refused to certify classes based on damages analyses that make it. This Court should now do the same. The Court has previously held that damages theories must comport with "market realities." *Zakaria v. Gerber Prod. Co.*, 755 F. App'x 623, 624 (9th Cir. 2018). One specific market reality is that companies will reduce their supply of a product if demand for the product decreases to avoid losing money, and damages analyses must account for this. This Court should hold that if a damages analysis artificially assumes a fixed supply—that a defendant would insist on making the same number of sales no matter how much it had to cut price to do so—it will be excluded as unreliable and cannot at any rate be the basis for certifying a class.

# ARGUMENT

## A. Market Prices Are Set By The Interaction Of Supply And Demand, So Estimating A Change In Price Requires Considering Both Of Them.

In false or deceptive advertising class actions like this one, the most common "measure of damages" is to calculate the "price premium" that the allegedly false or deceptive marketing claim caused. *In re NJOY, Inc. Consumer Class Action Litig.*, 2016 WL 787415, at *5 (C.D. Cal. Feb. 2, 2016). Under a price-premium approach, damages are defined as the difference between (i) the product's actual market price as sold with the misrepresentation (the "as-is" price) and (ii) the market price the product *would have had* if the misrepresentation had not been made (the "but-for" price, meaning the price the product would have had but for the misrepresentation). *See In re General Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 224 (S.D.N.Y. 2019). The price-premium damages measure is the one Plaintiffs' experts use in this case. (2-ER-289 (Plaintiffs' expert describing the price premium as "the difference between the price actually paid and an estimate of the market price of the same product if the consumers were fully informed about its attributes").)

Calculating a price premium thus requires two inputs. The first—the "price actually paid"—is a matter of historical fact. But the second is not. It is instead an estimate of what the price would have been had the alleged misrepresentation not been made.

Economists universally agree—and plaintiffs do not dispute—that market prices result from "a combination of market demand and market supply." *See In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015). High demand and low supply results in high prices, because only the consumers who want the product the most and can pay the most are able to get it. Consider tickets for the Super Bowl. In contrast, low demand and high supply results in low prices, because anyone who wants the product can get it, even those who don't value it much and can't pay much. Consider a plentiful commodity such as a plain paper plate.

Because consumers and producers are not all alike, economists express demand and supply as ranges, or "curves." The place where a product's demand and supply curves intersect is the market price for that product, as shown below:



The demand curve (red) shows how much product the total population of consumers would purchase at various price points—the lower the price, the greater the number of consumers who would buy the product, and the greater the volume of product that consumers as a whole would purchase. The supply curve (blue) shows how much product the total population of suppliers would produce at various price points—the higher the price, the greater the number of suppliers who would choose to supply it, and the greater the volume that suppliers as a whole would produce. The intersection of these two curves is the equilibrium price or "fair market value."

**B. Conjoint Analyses Assess Only Demand, Not Supply.**

The basic argument of plaintiffs in a false or deceptive advertising case like this one is that the false or deceptive statement increased consumer demand for the product—it made the product look better than it actually was. And therefore, if the false or deceptive statement was removed, demand for the product would decrease.

To assess the decrease in demand, plaintiffs usually rely on a choice-based "conjoint analysis." A conjoint analysis is "a statistical technique capable of using survey data to determine how consumers value a product's attributes." *NJOY, Inc.*, 2016 WL 787415, at *6 (quotation omitted). "[I]n conjoint analysis, survey respondents are asked to make a series of choices between different combinations of product attributes." *Id.* (alteration in original) (quotation omitted). By "[c]ombining the responses to all of the choice sets, the analyst can then use established statistical methods to estimate the separate value (or part-worth) that consumers attach to each product attribute." *Id.*

(quotation omitted). Using this technique, plaintiffs' experts can isolate the "willingness to pay" associated with a product attribute or representation relevant to plaintiffs' claims. *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014).

There are real doubts about whether a conjoint analysis can accurately quantify even a change in demand.[2] But what is undisputed is that a conjoint analysis ***only*** assesses changes in demand. A conjoint analysis makes no attempt to assess changes in supply, and it is incapable of doing so because it does not get input from suppliers.

---

[2] Conjoint analysis was created to provide helpful, directional guidance on product design. *See, e.g.*, Rene Befurt et al., *Supply Side Considerations When Using Conjoint Analysis in Litigation*, in *Handbook of Marketing Analytics: Methods and Applications in Marketing, Public Policy, and Litigation* 2 (Natalie Mizik & Dominique Hanssens eds. 2024), https://mitsloan.mit.edu/shared/ods/documents?PublicationDocumentID=10240. Conjoint analysis was not created to provide quantitative measurements, and it is not good at doing so, as one of the leading authorities on conjoint models, Bryan Orne, explains:

> Conjoint analysis can reveal product modifications that can increase market share, but it will probably not reveal how much actual market share will increase. Conjoint analysis can tell us that the market is more price sensitive for Brand *A* than Brand *B*, but we probably do not know the exact price sensitivity of either one. Conjoint analysis can identify which market segment will be most likely to purchase your client's product, but probably not the exact number of units that will be purchased. . . .
>
> Do not let th[e] enthusiasm get out of hand. . . . While conjoint [models] are excellent tools for revealing strategic moves that can improve the success of a product, . . . we must avoid thinking that adjusted conjoint models can consistently and accurately predict volumetric [i.e., quantitative] absolutes.

Bryan Orne, *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research* 26–27 (4th ed. 2019).

A conjoint analysis only surveys consumers, and it can therefore assess only consumer willingness to purchase. It does not survey suppliers, and it therefore cannot assess willingness to supply.

Because market prices depend on the interaction of supply and demand, some assessment of supply must be added to a conjoint analysis's assessment of consumer demand to estimate market price. This need to add a supply assessment is universally recognized. As one economist explains, "[w]illingness to pay is not market price . . . conjoint analysis provides the 'demand curve' . . . you need to consider demand and supply when setting the market price." *See* John Hauser, *Note on Conjoint Analysis* 16 (MIT Sloan Courseware Fall 2015), https://ocw.mit.edu/courses/15-810-marketing-management-analytics-frameworks-and-applications-fall-2015/resources/mit15_810f15_conjoint/. Or, to put it another way, "[c]onjoint studies can play a vital role in feature valuation provided that they are properly designed, analyzed, *and supplemented by information on the competitive and cost structure of the marketplace*." Greg M. Allenby et al., *Economic Valuation of Product Features*, 12 Quantitative Marketing and Economics 421, 455 (2014) (emphasis added).

### C. Plaintiffs' Experts Err In How They Address Supply: They Irrationally Keep It Constant.

Plaintiffs' damages analysis becomes irrational and systematically unreliable at the step where it adds supply to estimate a market price. Instead of conducting a survey or collecting other data to determine how producers would change their supply in

response to a change in demand, Plaintiffs simply ***assume*** that the Defendant would hold supply at a fixed level. To be perfectly clear, this means they assume that, if consumer demand for the defendant's product dropped, the defendant would insist on making the same total number of sales—no matter how far it had to lower its price to do so, even if it meant losing money on each sale. This assumption has no basis in economic theory, and Plaintiffs make no attempt to defend it based on evidence from the Defendant in this case. It is a false assumption, and its consequence is that Plaintiffs' analysis makes no attempt to measure how actual *market prices* would change. The analysis is therefore incapable or measuring a *market price* premium.

The most perceptive courts have said exactly this: a damages model that makes no attempt to assess how supply would change "does not actually calculate a market price premium" at all. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022). Instead, by "look[ing] only to the demand side of the market equation," it "convert[s] what is properly an objective evaluation of relative fair market values into a seemingly subjective inquiry of what the average consumer wants." *NJOY, Inc.*, 120 F. Supp. 3d at 1119 (citation modified).

In economic terms, Plaintiffs' experts assume that supply is "inelastic." This assumption artificially forces the entire effect of lower demand to be reflected in a lower price, rather than a combination of lower supply and price. The precise way in which it exaggerates the amount by which price would drop—and therefore likewise exaggerates

the "price premium" the allegedly false representation caused—is shown in the chart below:




To put it simply, "demand-side only valuations tend to overstate market prices." Greg Allenby et al., *Computing Damages in Product Mislabeling Cases: Plaintiffs' Mistaken Approach in* Briseno v. ConAgra*,* 45 Prod. Safety & Liab. Rep. 208 (Feb. 27, 2017) (as reprinted by Bloomberg Law, at 3). If the analysis properly assumed that suppliers would reduce quantity in response to reduced demand, the price drop and corresponding "price premium" would be much lower or even nonexistent. *Id.*

Plaintiffs sometimes retort that supply must be held constant in the but-for world because it is fixed as a matter of history in the actual world. But the same could equally be said of both demand and price—both are fixed as a matter of history in the actual world. But that does not mean they must be held constant in the but-for world. The

whole purpose of the damages exercise is to estimate how supply, demand, and price would *change* in the hypothetical world where the alleged misrepresentation was not made. Demand is not the only things that would change in that hypothetical world. Supply would change, too.

Of course, once the but-for market price is calculated, the difference between that price and the actual, historic market price (the price premium) must be multiplied by the total quantity of actual historic sales to calculate damages. But that is the second step of the damages model. Plaintiffs' error is in the first step—how they calculate the price premium, which they do by making the irrational assumption that producers would insist on making exactly the same number of sales no matter how low it forced the price and how much money they lost.

To assume, in the but-for world, that producers would not lower their supply in response to a decrease in demand cannot be justified as a matter of economic theory, because it is economically irrational. Rational businesses try to make money, not lose money, so they will not insist on maintaining sales volume if it means cutting price below what is profitable. *See* Jeffrey Church & Roger Ware, *Industrial Organization: A Strategic Approach* 23 (Irwin McGraw-Hill 2000) ("At the equilibrium price both firms and consumers are able to fulfill their planned or desired trades: firms are able to sell their profit-maximizing quantities and consumers are able to purchase their utility-maximizing quantities."); Lisa Cameron et al., *Price Premium Damages in Product Market Litigation: Issues in Survey-Based Market Simulations,* in *Product Liability, 20th ed.*, *International*

*Comparative Legal Guides* 23, 26 (Adela Williams & Tom Fox eds. 2022) ("It is a fundamental principle of economics that any market price is determined by the interaction of willing buyers (who maximise utility) and willing sellers (who maximise profits)."); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 901 (W.D. Tex. 2008) (explaining that "all rational economic actors . . . seek to maximize their profits." (quotation omitted)). To assume otherwise is "heroic"—and that is not a good thing. *See* Rene Befurt et al., *Supply Side Considerations*, at 39. Consider a hypothetical example: Suppose a sunscreen retailed for $12.00 with a per-unit cost of $11 and a conjoint analysis showed that removing a "dermatologist recommended" claim would reduce demand by 20 percent. No reasonable seller would cut prices to $9.60 to maintain volume, just to sell every tube at a $1.40 loss. A rational seller would instead keep the price above $11, accepting fewer sales in order to keep making some money.[3]

In addition to being unsound as a matter of economic theory, the "fixed supply assumption" also ignores the factual record in this case and practical "market realities." *Zakaria*, 755 Fed. App'x at 624 (explaining that conjoint analysis needed to "reflect market realities"). Here, Sazerac made it unambiguously clear that it would *not* drop its

[3] In litigation, some experts may assert that there is a limit to how much their damages model would reduce prices. This sort of ad hoc limitation may allow experts to avoid the most egregious examples of the problem—e.g., but-for worlds in which a producer would sell at a significant loss to maintain volume—but there is no principled basis for it. In fact, the need to apply such a limitation is a tacit admission of the problem.

prices in response to reduced demand because of its overall product strategy. (3-ER-474.) Certainly, it would not drop prices indefinitely to keep sales volume constant.

### D. This Court Should Join Those That Have Rejected Damages Analyses That Irrationally Keep Supply Constant, Contrary To Market Realities.

A damages analysis that refuses to consider how producers would lower supply in response to lower consumer demand is incapable of measuring a but-for market price and corresponding market price premium. This Court should join the courts that have excluded such analyses and declined to certify classes based on them.

A leading case is *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.* There, the court excluded expert damages opinions because they failed to account for supply side factors. 500 F. Supp. 3d at 949. As the court explained, "[c]alculating a premium by comparing (1) the actual price of vehicles sold with defeat devices to unwitting consumers, and (2) consumers' willingness-to-pay for vehicles with the defeat device (as opposed to the market price of vehicles with the defeat device) is comparing apples and oranges." *Id.* In particular, "presuming that Defendants would have sold the same number of cars, at the exact price that consumers would have been willing to pay, is not a way to reliably incorporate supply-side considerations." *Id.*

Many district courts across the country have reached the same conclusion and have refused to certify class actions based on damages analyses that irrationally and inaccurately hold supply constant in the but-for world. *See, e.g.*, *Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d at 237 (discounting report because it incorporated

"demand-side-only evidence" and this "fail[ed] to estimate hypothetical market conditions"); *Zakaria*, 2017 WL 9512587, at *21 (decertifying damages class based on conjoint analysis that measured only plaintiffs' changed willingness to pay as "insufficient to establish a basis for calculating either restitution or actual damages"), *aff'd*, 755 F. App'x 623 (9th Cir. 2018); *NJOY, Inc.*, 2016 WL 787415, at *6–7 (denying class certification because plaintiffs' proffered conjoint analysis tested only what consumers were willing to pay "without considering other factors in a functioning marketplace," and therefore "[did] not address the fair market value of NJOY's e-cigarettes absent the misrepresentations and omissions." (emphasis and quotation omitted)); *Saavedra*, 2014 WL 7338930, at *5 (denying certification of damages class, in part because proffered conjoint analysis accounted for demand but not supply, and reasoning that such a "method of computing damages converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants. The Court has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e., what could be called sellers' willingness to sell).").

The Court should add its voice to the weight of this authority and the relevant academic literature. As the Court has previously held, an expert's "analysis [must] reflect market realities and prices for [the relevant] products." *Zakaria*, 755 F. App'x at 624. When an analysis wrongly assumes that a defendant would insist on making the exact

same number of sales in response to lower consumer demand, no matter how low it had to drop its prices to do so, the analysis does not reflect market realities. The analysis is therefore not helpful, relevant, or reliable. To put it simply, it is not an analysis of market price *at all*.

## CONCLUSION

This Court should reverse the order granting class certification because it relies on precisely this kind of flawed analysis that fails to account for "market realities." *Id.*

Dated: March 30, 2026

Respectfully submitted,

*s/ Aaron D. Van Oort*
Aaron D. Van Oort
Tyler A. Young
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
(612) 766-7000

E. Paul Cauley, Jr.
FAEGRE DRINKER BIDDLE & REATH LLP
2323 Ross Avenue
Suite 1700
Dallas, TX 75201
(469) 257-2503

Teresa Akkara
FAEGRE DRINKER BIDDLE & REATH LLP
1144 15th Street
Suite 3400
Denver, CO 80202
(303) 607-3539

*Counsel for Amicus International Association of Defense Counsel*

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limitation of Fed. R. App. 29(a)(5), and 32(a)(7)(A) because it is fewer than 15 pages, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Ninth Circuit Rule 32-1(c).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Office 365 ProPlus version of Word in 14-point Garamond.

Dated: March 30, 2026

*s/ Aaron D. Van Oort*
Aaron D. Van Oort

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2026, a copy of the foregoing document was filed with the Clerk of the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will cause a notice of electronic filing to be served on all registered counsel of record.

*s/ Aaron D. Van Oort*
Aaron D. Van Oort