REDACTED VERSION

**FILED UNDER SEAL**

**No. 25-4833**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

TERRY MYERS and DAWN OUTLAW,

Plaintiffs - Appellees

v.

SAZERAC COMPANY, INC.,

Defendant - Appellant

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 3:23-CV-522-EMC
HON. EDWARD M. CHEN

---

# APPELLANT'S OPENING BRIEF

---

DORSEY & WHITNEY LLP
Creighton R. Magid
1401 New York Avenue, NW
Suite 900
Washington, DC 20005
Telephone: (202) 442-3555

QUINN EMANUEL URQUHART & SULLIVAN, LLP
John Bash
300 W. 6th St.
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Appellant Sazerac Company, Inc.*

REDACTED VERSION

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

ISSUES PRESENTED .......... 4

STATEMENT OF THE CASE .......... 4

SUMMARY OF THE ARGUMENT .......... 11

STANDARD OF REVIEW .......... 12

ARGUMENT .......... 13

I. THE DISTRICT COURT IMPROPERLY CERTIFIED THE CLASS WITHOUT ENSURING THAT PLAINTIFFS' MODEL COULD RELIABLY MEASURE CLASS-WIDE DAMAGES .......... 13

A. Rule 23 required Plaintiffs to prove that their damages model could reliably measure class-wide damages. .......... 13

B. The district court erred as a matter of law in certifying a class without engaging in a "rigorous analysis" of whether plaintiffs' damages methodology could "reliably calculate damages in a manner common to the class." .......... 16

II. PLAINTIFFS' PROPOSED DAMAGES MODEL CANNOT RELIABLY ESTABLISH CLASSWIDE DAMAGES. .......... 22

A. The wrong survey population guarantees meaningless results. .......... 23

B. Plaintiffs' proposed survey ignores convenience, [redacted]. .......... 25

C. The failure to consider supply-side factors renders the damages methodology unreliable. .......................................... 31

CONCLUSION .................................................................................... 40

CERTIFICATE OF COMPLIANCE ..................................................... 41

CERTIFICATE OF SERVICE ............................................................. 42

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890 (3d Cir. 2022) .......... 15

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ............................... passim

*Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025) ........... 15, 19, 20

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025 (9th Cir. 2010) ................................................ 20, 21

*Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147 (1982) ................................ 13

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018) ..... 36

*Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014) ........ 13

*In re Gen. Motors Ignition Switch Litig.*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019) ................................................................. 31, 32, 38, 39

*In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050 (C.D. Cal. 2015) .......................................................................... passim

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022) ............................................................................................ 32

*Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025) ........................................... passim

*Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867 (N.D. Cal. 2016) ................................................................. 20, 21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (*en banc*) ....................................... passim

*Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366, 2014 U.S. Dist. LEXIS 179088, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .........6, 38

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............ 15, 16, 19

*United States v. Valencia-Lopez*, 971 F.3d 891 (9th Cir. 2020)........ 19, 29

**Statutes**

28 U.S.C. § 1332(d) ............................................................................ 3

**Other Authorities**

Greg M. Allenby *et al.*, Economic Valuation of Product Features, 12 *Quantitative Marketing and Economics* 421 (2014)................ 26, 28

Greg M. Allenby, *et al.*, Valuation of Patented Product Features, 57 *J. of Law and Economics*, 629 (2014) ............................................ 26

John Hauser, Note on Conjoint Analysis, *MIT Sloan Courseware* 16 (2015) ............................................................................................... 26

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed. 2003) ................................................................ 23

Neil T. Bendle, *et al.*, 155-56 Marketing Metrics (3d ed. 2016) ....... 26, 30

Rene Befurt *et al.*, *Supply Side Considerations When Using Conjoint Analysis in Litigation* (May 2024), https://mitsloan.mit.edu/shared/ods/documents?PublicationDocumentID=10240 ....................................................... 33

Shari Seidman Diamond, 377 Reference Guide on Survey Research, in *Reference Manual on Scientific Evidence* (3d ed. 2011)........... 23, 25

Suneal Bedi & David Reibstein, *Damaged Damages: Errors in Patent and False Advertising Litigation*, 73 Ala. L. Rev. 385 (2021) ............................................................................................... 27

**Rules**

Fed. R. Civ. P. 23(a) ........................................ 11, 13

Fed. R. Civ. P. 23(b) ........................................ 11, 14

Fed. R. Civ. P. 23(b)(3) ........................................ passim

Fed. R. Civ. P. 23(f) ........................................ 3, 10

Fed. R. Evid. 101(a) ........................................ 15, 16

Fed. R. Evid. 702 ........................................ 15, 19, 22

# INTRODUCTION

This appeal challenges an order certifying a class without the showing that Rule 23 requires: that Plaintiffs' proposed damages model, if executed, could reliably calculate damages in a manner common to the class.

Plaintiffs claim that the labels on single-serving bottles of Sazerac's Fireball Cinnamon malt beverage ("Fireball Malt") mislead California consumers into believing that the product is Sazerac's whisky-based Fireball Cinnamon Whisky ("Fireball Whisky"). Fireball Whisky is sold at liquor stores and other retailers licensed to sell spirits, whereas Fireball Malt is sold at convenience stores and other retailers licensed to sell only beer and wine.

Plaintiffs' damages theory is that consumers paid more for Fireball Malt than they would have had the labels more emphatically identified the product as a malt beverage. Plaintiffs seek to prove a class-wide "price premium" by means of a choice-based conjoint survey intended to infer differences in consumer demand for Fireball Malt with the existing label as compared with a hypothetical label further emphasizing the product's malt base alcohol. Plaintiffs' proposed

conjoint survey, however, cannot reliably measure any class-wide price premium.

First, the survey population is not related to the class definition. Plaintiffs cannot even ensure that a single member of the putative class will be surveyed, while all but guaranteeing that the survey population will consist of consumers who are not reflective of class members, making the survey results meaningless.

Second, the survey omits the most important factor in purchases of ready-to-drink alcoholic beverages – convenience. The distortion caused by this omission will render the survey results unreliable.

Third, Plaintiffs ignore the supply-side factors that are essential to establishing prices. A conjoint survey, even if designed correctly, only reflects *demand*. To establish a price premium, supply-side factors must be considered. It is undisputed that Sazerac would not and could not change the price of Fireball Malt even if, as Plaintiffs claim, demand would decrease with a label change. Because Plaintiffs' damages model does not consider the supply side at all, it is incapable of establishing any price premium.

A plaintiff proffering a damages model to satisfy the

predominance requirement of Fed. R. Civ. P. 23(b)(3) must show, by a preponderance of the evidence, that the model can reliably calculate class-wide damages. A district court may not certify a class unless it has determined, after conducting a "rigorous analysis," that a plaintiff has met this burden. The district court below conducted no such analysis, abdicated its gatekeeping responsibilities – treating foundational defects in Plaintiffs' model as matters of weight – and certified a class even though Plaintiffs' proposed damages model could not reliably establish class-wide damages.

Because the district court certified a class without determining whether the damages model was reliable, and because the record shows that the model could not reliably establish class-wide damages, the Court should reverse the class certification order.

## JURISDICTIONAL STATEMENT

Plaintiffs invoked the district court's jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). On February 12, 2025, the district court issued an order granting Plaintiffs' motion for class certification. Sazerac timely petitioned for permission to appeal pursuant to Fed. R. Civ. P. 23(f) on February 26, 2025. This Court

granted the petition on July 31, 2025.

## ISSUES PRESENTED

1. Whether the district court erred as a matter of law in certifying the class without requiring Plaintiffs to prove, by a preponderance of the evidence, that their damages model was capable of reliably calculating damages in a manner common to the class.

2. Whether the district court erred as a matter of law in certifying a class when Plaintiffs' damages model could not reliably calculate class-wide damages.

## STATEMENT OF THE CASE

Sazerac is a producer of alcoholic beverages. Among its products are beverages sold in 50 ml and 100 ml single-serving bottles. (3-ER-474)

For single-serving "ready-to-drink" beverages, [redacted] (3-ER-383; 3-ER-470) Consumers value a product they can buy when and where they commonly shop – near home, on the way to work, and during extended store hours. (3-ER-470) With this in mind, Sazerac introduced Fireball Malt, a malt beverage version of Fireball Whisky. (1-ER-005; 3-ER-499) Fireball Malt and Fireball Whisky share the same flavor profile. (1-ER-003) But because

the flavorless base alcohol in Fireball Malt is produced through fermentation rather than through distillation, Fireball Malt may be sold at retail locations licensed to sell malt beverages, including beer, whereas Fireball Whisky may only be sold at retail locations licensed to sell distilled spirits. (3-ER-499; 1-ER-004) Because there are 24,000 retailers licensed to sell malt beverages in California and only 14,000 spirits retailers, the introduction of Fireball Malt made the taste of Fireball more convenient to the public. (3-ER-499)

The labels of Fireball Malt and Fireball Whisky share some branding elements, such as the dragon image, color, and font to convey to the public that Fireball Malt has the same flavor profile as Fireball Whisky and is a genuine Fireball product. (3-ER-505) At the same time, the labels clearly identify Fireball Malt as a "MALT BEVERAGE" and state the product's lower alcohol percentage. (2-ER-340-41) Furthermore, Fireball Malt is sold at retailers that do not sell distilled spirits, such as convenience stores. (3-ER-500)

In this lawsuit, Plaintiffs Terry Myers and Dawn Outlaw claim that the labels on single-serving bottles of Fireball Malt mislead consumers into believing that they are purchasing Fireball Whisky. (1-

ER-002) Plaintiffs moved for certification of a class comprising all California consumers who have purchased Fireball Malt since February 3, 2019. (1-ER-002) In an effort to satisfy the predominance requirement of Fed. R. Civ. P. 23(b)(3), Plaintiffs assert that all putative class members paid a "price premium" for Fireball Malt. Plaintiffs' theory is that if the labels on single-serving bottles of Fireball Malt more conspicuously identified the product as a malt beverage, fewer consumers would purchase the product and Sazerac would have to reduce the product's price. (1-ER-018)

In support of this assertion, Plaintiffs proffered a declaration from Dr. Moshe Ben-Akiva proposing to conduct a "choice-based conjoint survey," which he claims will "measure" a "price premium that consumers paid as a result of their false belief that the Fireball Cinnamon is whiskey." (2-ER-272-73).[1] Dr. Ben-Akiva is a professor of

---

1 "Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes — often called the market's willingness to pay." *Saavedra v. Eli Lilly & Co.*, No. 2:12-cv-9366, 2014 U.S. Dist. LEXIS 179088, at *12, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014). "[I]n conjoint analysis, survey respondents are asked to make a series of choices between different combinations of product attributes. . .. Combining the responses to all of the choice sets, the analyst can then use established statistical methods to estimate the separate value (or part-worth) that

civil engineering who studies transportation systems. (2-ER-270) Although acknowledging that "careful attention to the design and implementation" of conjoint surveys "is essential" (2-ER-284), Dr. Ben-Akiva has no experience designing or implementing conjoint surveys pertaining to consumer products. (2-ER-101-102)

Dr. Ben-Akiva proposed fielding a conjoint survey to a sample of adult California residents who, in the prior year, purchased (a) any Fireball product and (b) any alcoholic beverage in a supermarket, convenience store, gas station, or drug store. (2-ER-284) For example, a Californian who purchased a bottle of Fireball Whisky sometime in the previous year and who also purchased a six-pack of beer at a convenience store during the same year would qualify to take the survey. This all but guarantees that the survey respondents will *not* reflect the relevant population (Fireball Malt purchasers) because Fireball Whisky greatly outsells Fireball Malt in California and because [redacted] of Fireball Whisky buyers have never purchased Fireball Malt. (3-ER-477; 3-ER-464)

---

consumers attach to each product attribute." *In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118 (C.D. Cal. 2015).

For the survey, Dr. Ben-Akiva proposed using six attributes in his choice sets: brand name, product name, bottle size, alcohol percentage, alcohol type, and price. (2-ER-286-87) Notably absent from the list of attributes is "convenience" [redacted] (3-ER-383; 3-ER-470)

Dr. Ben-Akiva has no plans to study the supply side of the price equation. Rather, he will simply *assume* that Sazerac will sell the same quantity of Fireball Malt in the "but-for world" in which the product label is changed. (2-ER-289; 2-ER-309-13)

In its Opposition to the class certification motion, Sazerac argued that Dr. Ben-Akiva's proposed methodology was *incapable* of measuring damages on a class-wide basis. (Dkt. 65-7) Among other reasons why the proposed methodology would not and could not measure damages on a class-wide basis, Sazerac explained:

- Because the survey population was unlikely to include actual or likely purchasers of Fireball Malt – the relevant cohort – the survey results would be unreliable and meaningless.
- Although conjoint surveys are only valid if they include all of

the most important product attributes, the survey would omit [redacted] convenience.

- Even a properly constructed conjoint survey addresses only consumer preferences. To establish a "price premium," the supply side of the price equation in the "but-for world" must be analyzed. Plaintiffs' proposed methodology would not analyze the supply side at all, but would instead *assume*, without any basis, that sales volumes would remain the same and that the price would change.

(Dkt. 65-7)

The district court certified the putative class. (1-ER-041) Although noting that Fed. R. Evid. 702 required Plaintiffs to establish by a preponderance of the evidence that their methodology is based on "sufficient facts or data," is "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case" (1-ER-007), the district court concluded that the validity and reliability of their methodology was irrelevant, explaining that "even if Dr. Ben-Akiva's conjoint survey evidence were excluded under Daubert, that would not gainsay the fact

that damages can and will be proven on a classwide damages [sic]. The fact that damages might, without the survey evidence, be found to be $0 does not gainsay the classwide nature of the resolution of this issues [sic]." (1-ER-018) The district court further concluded that Dr. Ben-Akiva's inapt survey population "goes to the merits of the survey, and not the admissibility of it" on the ground that Sazerac had not shown that the proposed survey "rises to the level of 'junk science.'" (1-ER-022) Similarly, the district court held that assuming away the importance of convenience to purchasing decisions did not render Plaintiffs' methodology inadmissible because "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." (1-ER-025) Finally, the district court concluded that Plaintiffs' methodology adequately addresses supply-side factors because it used historical prices and quantities sold. (1-ER-027)

Sazerac timely petitioned this Court for permission to appeal from the class certification order pursuant to Fed. R. Civ. P. 23(f) on February 26, 2025. (2-ER-064) This Court granted the petition on July 31, 2025.

## SUMMARY OF THE ARGUMENT

A class may not be certified unless a court determines, after a "rigorous analysis," that plaintiffs have proven, by a preponderance of the evidence, that all requirements of both Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b) have been satisfied. Where, as here, a plaintiff seeks to satisfy the predominance requirement of Rule 23(b)(3) by establishing a "price premium" applicable to all members of the putative class, the plaintiff must establish, by a preponderance of the evidence, that its model or proposed model is capable of reliably measuring such "price premium" damages. The district court ignored this requirement and certified a class without analyzing whether Plaintiffs' proposed damages model was reliable or admissible. Instead, the district court concluded that a class could be certified because whether or not Plaintiffs' damages model proved unreliable at a later stage of the case, that determination would be common to the class. This was reversible error.

Under the correct legal standard, it is plain that Plaintiffs cannot meet their burden of proving that their proposed damages model is capable of reliably measuring a "price premium." Plaintiffs' survey

population is not tied to the class, so the results would not reliably reflect the views of class members – Fireball Malt purchasers. The proposed "conjoint survey" also elides any consideration of convenience – [redacted] – rendering the survey incapable of reliably estimating product values. Independently, Plaintiffs' damages model ignores supply-side factors, including the undisputed fact that Sazerac cannot and would not change the pricing of Fireball Malt even if demand fell as a result of re-labeling the product to emphasize even more that it is a "malt beverage." Without consideration of such supply-side factors, the model can say nothing about an alleged "price premium" – and certainly cannot reliably establish such a price premium. The district court therefore erred as a matter of law in certifying the class.

## STANDARD OF REVIEW

A district court's "determination of underlying legal questions" in a class certification decision is reviewed de novo. *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1308 (2025). "[W]hether an expert's damages model 'is capable of showing class-wide impact, thus satisfying one of the prerequisites of

Rule 23(b)(3) of the Federal Rules of Civil Procedure'" is reviewed for an abuse of discretion. *Id.* (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (*en banc*)).

## ARGUMENT

## I. THE DISTRICT COURT IMPROPERLY CERTIFIED THE CLASS WITHOUT ENSURING THAT PLAINTIFFS' MODEL COULD RELIABLY MEASURE CLASS-WIDE DAMAGES.

### A. Rule 23 required Plaintiffs to prove that their damages model could reliably measure class-wide damages.

"Before it can certify a class, a district court must be 'satisfied, after a rigorous analysis, that the prerequisites' of both Rule 23(a) and 23(b)(3) have been satisfied." *Olean*, 31 F.4th at 664 (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982)). "'[P]laintiffs wishing to proceed through a class action must actually *prove* – not simply plead – that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3),' and must carry their burden of proof 'before class certification.'" *Id.* (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275-76 (2014)) (emphasis and alteration in original).

This appeal focuses on Rule 23(b)(3), which requires plaintiffs to establish, by a preponderance of the evidence, that "questions of law or

fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *Olean*, 31 F.4th at 665. The predominance requirement is "even more demanding" than Rule 23(a)'s requirements. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Where, as in this case, plaintiffs seek to satisfy Rule 23(b)(3) with a damages model purportedly "capable of showing class-wide impact," they must demonstrate "by a preponderance of the evidence, that the model will be able to reliably calculate damages in a manner common to the class at trial." *Lytle*, 114 F.4th at 1024; *see also Comcast*, 569 U.S. at 34 (plaintiffs must "establish[] that damages are capable of measurement on a classwide basis."). To satisfy these requirements, Plaintiffs need "a methodology that identifies damages that are . . . the result of the wrong." *Comcast*, 569 U.S. at 37. A methodology does not do so if it "fail[s] to measure damages resulting from the particular . . . injury on which [plaintiffs'] liability in th[e] action is premised." *Id.* at 36. Indeed, *Comcast* expressly rejected the notion that "at the class certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Id.* at 36 (emphasis in original).

A plaintiff seeking class certification must satisfy its Rule 23(b)(3) burden with admissible evidence. *Olean*, 31 F.4th at 665. Whether evidence is admissible, and whether a methodology can reliably calculate damages in a manner common to the putative class, is governed by Fed. R. Evid. 702. *See, e.g., Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016) (Fed. R. Evid. 401, 403, and 702 dictate whether evidence offered in support of class certification is reliable and admissible); Fed. R. Evid. 101(a) (the Rules of Evidence apply in all proceedings in United States courts unless excepted in Fed. R. Evid. 1101); *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 905 (3d Cir. 2022) (Rule 23 proceedings are not among the excepted proceedings).

"[A] proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025). "[T]here is no presumption in favor of admission." *Id.* "[C]hallenges to an expert's opinion go to the weight of the evidence *only if a court first finds it more likely than not that an expert has a sufficient basis to*

*support an opinion.*" *Id.* (emphasis added).[2]

### B. The district court erred as a matter of law in certifying a class without engaging in a "rigorous analysis" of whether plaintiffs' damages methodology could "reliably calculate damages in a manner common to the class."

The district court certified a class without requiring Plaintiffs to prove, by a preponderance of the evidence, that Dr. Ben-Akiva's proposed methodology was capable of "reliably calculat[ing] damages in a manner common to the class at trial." *Lytle*, 114 F.4th at 1024. This Court reviews the legal error de novo. *Id.* at 1023.

Rather than holding Plaintiffs to their burden of showing a reliable method of calculating class-wide damages, the district court expressly disavowed the need for Plaintiffs to demonstrate that Plaintiffs' model could reliably measure class-wide damages. In the

---

[2] This Court has previously held that "whether a 'full' or 'limited' *Daubert* analysis should be applied may depend on the timing of the class certification decision." *Lytle*, 114 F.4th at 1031. *Tyson Foods* and Fed. R. Evid. 101(a) cast doubt on the notion that anything short of a full Rule 702 analysis should be conducted as part of the "rigorous analysis" into whether all elements of Rule 23 have been met. Regardless, because Dr. Ben-Akiva has set forth his proposed methodology, it is clear at the class certification stage that the methodology does not satisfy Rule 702 and that a "predictive judgment" can be made at the class certification stage that it is unlikely that his methodology will "eventually bear fruit." *Lytle*, 114 F.4th at 1031.

district court's view, it did not need to do so because "even if Dr. Ben-Akiva's conjoint survey evidence were excluded under *Daubert*, that would not gainsay the fact that damages can and will be proven on a classwide damages [sic]. The fact that damages might, without the survey evidence, be found to be $0 does not gainsay the classwide nature of the resolution of this issues [sic]." (1-ER-018) The district court later repeated that conclusion, stating, "even if the conjoint survey evidence were, contrary to the Court's ruling herein, excluded under *Daubert*, that would only inform the amount of damages Plaintiffs could recover (including possibly $0). The ultimate decision, whatever it is, would still apply to the entire class." (1-ER-41)

The district court's conclusion that no reliability determination was necessary because a *future* determination of the methodology's admissibility would affect the entire class conflicts with well-established law. A class *cannot be certified* unless plaintiffs establish, by a preponderance of the evidence, that a proposed damages model "will be able to reliably calculate damages in a manner common to the class at trial." *Lytle*, 114 F.4th at 1024; *Olean*, 31 F.4th at 664 (plaintiffs must carry their burden of proving "that their proposed class

satisfies each requirement of Rule 23 . . . *before class certification*.") (emphasis added); *Comcast*, 569 U.S. at 34 (to satisfy the predominance requirement, a plaintiff must "establish[] that damages are capable of measurement on a classwide basis."). As *Comcast* explains, it is not the case that "at the class-certification stage any method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary," for that "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Comcast*, 569 U.S. at 36. The district court's approach directly contravenes the requirements for class certification set forth by the Supreme Court and by this Court.[3]

The district court also explicitly disavowed any need to analyze Dr. Ben-Akiva's methodology pursuant to Rule 702. The court concluded that Sazerac's arguments regarding the methodology's unreliability "go[] to the merits of the survey, and not the admissibility of it" (1-ER-022); that the methodology was sufficient "at this stage"

3 It is true that this Court has stated that "[t]he theoretical possibility that [a damages] model, when executed, will reveal no damages thus does not undermine predominance, because that result would nonetheless be common to the class." *Lytle*, 114 F.4th at 1026. But that refers to the *result* of a reliable methodology once implemented, not to the methodology itself.

because Sazerac had not demonstrated that the methodology "rises to the level of 'junk science'" (1-ER-022); and that "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." (1-ER-025) This, too, was reversible error.

The Supreme Court in *Tyson Foods* and this Court in *Olean* have made it clear that plaintiffs seeking class certification must carry their burden of proving each element of Rule 23 through admissible evidence. *See Olean*, 31 F.4th at 665; *Tyson Foods*, 577 U.S. at 455. Simply "dismissing an argument as 'going to the weight, not admissibility, of [the expert's] testimony' is not a reliability determination." *United States v. Valencia-Lopez*, 971 F.3d 891, 899 (9th Cir. 2020); *see also* Fed. R. Evid. 702 Advisory Committee Note to 2023 Amendments ("[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)."). Rather, "challenges to an expert's opinion go to the weight of the evidence *only if a court first finds it more likely than not that an expert has a sufficient basis to support an opinion*." *Engilis*, 151 F.4th at 1049 (emphasis added).

"'Judicial gatekeeping is essential' to ensure that an expert's conclusions do not 'go beyond what the expert's basis and methodology may reliably support." *Id.* (quoting Advisory Committee notes to 2023 amendment to Rule 702). "The district court 'cannot abdicate its role as gatekeeper.'" *Id.* at 1050.

Here, however, the district court failed to act as a gatekeeper. It did not grapple with the question of whether Plaintiffs' methodology was incapable of measuring a price premium. The district court's view that admissibility determinations are only necessary with respect to "junk science" contravenes this Court's holding in *Engilis* that simply determining that an opinion is not "junk science" does not make it admissible – "'shaky' expert testimony, like any expert testimony, must still be 'admissible,' and this requires a determination by the trial court that it satisfied the threshold requirements established by Rule 702." *Engilis*, 151 F.4th at 1050.

Similarly, the district court misapplied *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025 (9th Cir. 2010), and *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867 (N.D. Cal. 2016), which it cited for the proposition that "technical

inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." (1-ER-016) (quoting *Fortune Dynamic*, 618 F.3d at 1036). Both *Fortune Dynamic* and *Mullins* concerned "technical inadequacies" in surveys such as the format of the questions. *See Fortune Dynamic*, 618 F.3d at 1037 (challenge to failure to compare products side-by-side and "highly suggestive" questions); *Mullins*, 178 F. Supp. 3d at 905 (challenge to "survey question design"). Plaintiffs' survey design here is rife with such errors[4], but the issues here go beyond mere "technical inadequacies" and address the overall *incapability* of Plaintiffs' model to establish a price premium.

Here, the fundamental flaws identified by Sazerac show that Dr. Ben-Akiva's survey would not accord with accepted principles for measuring a price premium on the facts of this case. Although a conjoint survey may, as a general matter, be an acceptable method for

[4] For example, the wording of Plaintiffs' survey suggests to respondents that "spirits" is the correct answer and primes respondents to understand that a "malt-based beverage" tastes like beer. Consequently, respondents familiar with the flavor of Fireball would eliminate "beer or other malt-based beverage" as an answer, distorting the responses. (3-ER-378-79)

measuring a price premium, the district court had a duty to ensure that the proposed survey "reflects a reliable application of the principles and methods *to the facts of the case*." Fed. R. Evid. 702(d) (emphasis added). The district court abdicated that duty here.

## II. PLAINTIFFS' PROPOSED DAMAGES MODEL CANNOT RELIABLY ESTABLISH CLASSWIDE DAMAGES.

When examined under the proper standard, it is clear that Plaintiffs' proposed damages model is incapable of reliably measuring damages on a class-wide basis as required by *Comcast* and *Lytle*. *See Comcast*, 569 U.S. at 34 (plaintiffs must "establish[] that damages are capable of measurement on a classwide basis" to satisfy Rule 23(b)(3)); *Lytle*, 114 F.4th at 1024 (a plaintiff must demonstrate "by a preponderance of the evidence, that the [plaintiff's damages] model will be able to reliably calculate damages in a manner common to the class at trial."). First, Plaintiffs would survey the wrong population, ensuring that the results of their "conjoint survey" will not reflect the views of Fireball Malt purchasers. Second, the proposed conjoint survey cannot reliably determine consumers' relative willingness to pay for Fireball Malt as currently labeled and Fireball Malt with a different label, as it utilizes unrealistic choice sets and ignores [redacted]

[redacted] Third, the proposed damages model cannot reliably calculate a "price premium" because it does not account for supply-side factors.

### A. The wrong survey population guarantees meaningless results.

In survey methodology, "[t]he definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers." Shari Seidman Diamond, Reference Guide on Survey Research, in *Reference Manual on Scientific Evidence* 377 (3d ed. 2011). "A survey that provides information about a wholly irrelevant population is itself irrelevant." *Id.*; *see also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:159 (4th ed. 2003) (a "survey of the wrong 'universe' will be of little probative value in litigation.").

Just as a survey of Kia owners would yield no meaningful information about the values Porsche buyers place on various automotive attributes, Plaintiffs' proposed survey population – which may not include any buyers or likely buyers of Fireball Malt at all and, at a minimum, would be dramatically overweighted with Fireball Whisky purchasers – cannot reliably establish whether purchasers of

Fireball Malt would place a higher or lower value on Fireball Malt as currently labeled than on a hypothetical Fireball Malt even more conspicuously labeled as a malt beverage.

Plaintiffs' proposed survey population would be comprised of adult California residents who, in the prior year, purchased (a) any Fireball product and (b) any alcoholic beverage in a supermarket, convenience store, gas station, or drug store. (2-ER-284) Because Fireball Whisky greatly outsells Fireball Malt in California (3-ER-477) and [redacted] of Fireball Whisky purchasers have never purchased Fireball Malt (3-ER-464), it is uncertain whether the survey would include *any* actual or likely Fireball Malt purchasers. The survey may not include a single member of the putative class.

Even if some Fireball Malt purchasers were surveyed, they would almost certainly be greatly outnumbered by Fireball Whisky purchasers, who unsurprisingly would express a greater preference for a whisky product and whose preferences say nothing about what Fireball Malt purchasers would pay for Fireball Malt with different labeling. (3-ER-477; 3-ER-464) Because "[a] survey that provides information about a wholly irrelevant population is itself irrelevant,"

Diamond, *supra*, Plaintiffs did not and cannot meet their burden of showing, by a preponderance of the evidence, that their methodology is capable of reliably measuring damages on a class-wide basis. Moreover, because the survey population is not reflective of the putative class and therefore cannot determine whether a label change would make any difference to class members, Plaintiffs cannot satisfy *Comcast*'s requirement that their damages model identify "damages that are . . . the result of the [alleged] wrong." *Comcast*, 569 U.S. at 37. Rather, Plaintiffs propose a model whose measurements would be completely "arbitrary" and therefore cannot establish a basis for class certification. *Id*. at 36.

### B. Plaintiffs' proposed survey ignores convenience, [redacted]

It is fundamental to conjoint analyses that a survey's choice sets (a) closely approximate real-world market conditions and (b) include all primary purchase attributes. Plaintiffs' proposed conjoint survey fails to meet both requirements.

Extensive research demonstrates that conjoint surveys are unreliable if they do not closely replicate the real-world purchasing environment. *See, e.g.*, Greg M. Allenby *et al*., Economic Valuation of

Product Features, 12 *Quantitative Marketing and Economics*, 421, 433 (2014) ("The guiding principle in conjoint design for economic valuation of feature enhancement is that the conjoint survey must closely approximate the marketplace confronting consumers."); John Hauser, Note on Conjoint Analysis, *MIT Sloan Courseware* 16 (2015) ("conjoint analysis accurately represents how consumers will behave when faced with new products" only if "the stimuli are realistic."). Indeed, Dr. Ben-Akiva acknowledged that if a survey does not provide information to respondents in the same context that they would have it in the real marketplace, the results "[w]ill not be predictable of what people are doing in the marketplace." (3-ER-380)

Similarly, research shows that a failure to include all meaningful attributes in a conjoint survey renders its results unreliable. *See, e.g.*, Greg M. Allenby, *et al.*, Valuation of Patented Product Features, 57 *J. of Law and Economics*, 629, 642 (2014) (failure to include significant product features in conjoint surveys "invite[s] the respondents to make attributions that are not correct" and to overstate the value of surveyed attributes); Neil T. Bendle, *et al.*, 155-56 Marketing Metrics (3d ed. 2016) (A conjoint analysis "must include all the important features

according to which consumers make their choice. . .. The greatest potential error in this process would be to exclude meaningful attributes from the conjoint analysis."); Suneal Bedi & David Reibstein, *Damaged Damages: Errors in Patent and False Advertising Litigation*, 73 Ala. L. Rev. 385, 404 (2021) ("Omitting major features in order to estimate the willingness to pay for minor features biases the valuation of those included minor features upwards.")[5]

Plaintiffs' proposed survey involves patently unrealistic choice conditions and assumes away [redacted]

[redacted] (3-ER-383; 3-ER-470) [redacted] (3-ER-470) Plaintiff Myers's testimony exemplifies the importance of convenience. He testified that he purchased six bottles of Fireball Malt a week at a Chevron gas station on his way home from

---

[5] David Reibstein, Ph.D., catalogued the failures of Dr. Ben-Akiva's methodology in his report submitted in opposition to the class certification motion. (3-ER-344-453)

work because "[i]t was just convenient. It was there when I wanted it." (2-ER-091) He elaborated that "it was just convenient, you know, because I'm already there, I'm already popping in, it's two seconds, in and out." (2-ER-092) He further testified that although it would have been less expensive to buy a larger size bottle of Fireball Whisky at a liquor store, it made sense to purchase single-serving bottles of Fireball Malt at the Chevron gas station:

> My time's worth money . . .. I will buy a 4 dollar package of Tums at Chevron instead of going to Walmart and buying the 99 cent package because I'm not going to spend an hour going to Walmart to get a 99 cent package of Tums.

(2-ER-093-94)

Plaintiffs' proposed conjoint survey would focus on six attributes: brand names, product names, bottle size, alcohol percentage, alcohol type, and price. (2-ER-286) The survey omits convenience. *Id.*

As Allenby, *supra*, warns, this omission "invite[s] the respondents to make attributions that are not correct" and to overstate the value of the six attributes in the survey. More importantly, by omitting [redacted] attribute, the survey results will be unreliable. As Plaintiff Myers's testimony shows, consumers may well value Fireball Malt that is available where they commonly shop *more highly*

than Fireball Whisky that would require a special trip to a liquor store. But those same consumers, responding to Plaintiffs' proposed survey, could indicate a higher value for Fireball Whisky than for Fireball Malt if asked to value only the survey's six attributes. This distortion renders the survey results unreliable. (3-ER-385)

The district court brushed off both the omission of convenience as an attribute and the departure from real-world market conditions by characterizing the issues as ones of "weight" rather than "admissibility." As discussed above, this is wrong as a matter of law. Plaintiffs bear the burden of establishing a *reliable* damages methodology and "dismissing an argument as 'going to the weight, not admissibility, of [the expert's] testimony' is not a reliability determination." *Valencia-Lopez*, 971 F.3d at 899.

The district court tried to bolster its conclusion by noting that the proposed survey would use "real world" brand names, bottle sizes, and alcohol percentages, suggesting that these elements would somehow counteract the failure to account for convenience. (1-ER-024) But the inclusion of *some* realistic features does not address the distorting failure to include convenience as an attribute. As Bendle and

colleagues make clear, inclusion of some attributes in a conjoint analysis is not enough; a conjoint survey "must include *all* the important features according to which consumers make their choice." Bendle *et al.*, *supra*, at 155.

The district court also found reassuring Dr. Ben-Akiva's statement that "the choice sets in the conjoint survey will not include the Malt and the Whisky in the same choice set at the same time." (1-ER-24) That only compounds the problem. Comparing respondents' aggregated valuations of whisky products at a liquor store with different respondents' aggregated valuations of malt products removes any consideration of the value of convenience and says nothing about the relative values convenience store purchasers place on malt-based products available at the moment they are shopping versus spirit-based products that would require an investment of time and money to travel to a liquor store. And it fails to address the omission of convenience from the list of attributes that respondents are asked to value.

In short, a conjoint survey that omits convenience cannot reliably measure an alleged price premium attributable to the labeling of Fireball Malt. Rather, it would result in entirely "arbitrary"

measurements, which would "reduce Rule 23(b)(3)'s predominance requirement to a nullity. *Comcast*, 569 U.S. at 36. The district court erred by certifying a class despite the lack of a reliable damages methodology.

### C. The failure to consider supply-side factors renders the damages methodology unreliable.

As Dr. Ben-Akiva describes it, "the price premium is the difference between the price actually paid and an estimate of the market price of the same product if the consumers were fully informed about its attributes, or the 'but-for' scenario." (2-ER-289) Dr. Ben-Akiva acknowledges, however, that his proposed conjoint survey purports only to estimate consumer *demand* in a "but-for" world in which the Fireball Malt label emphasizes "malt beverage" more prominently. (2-ER-104-108); *see also In re Gen. Motors Ignition Switch Litig.*, 407 F. Supp. 3d 212, 235 (S.D.N.Y. 2019) (a conjoint survey "focuses only on changes to the demand side of the equation."). Consequently, a conjoint survey itself does not indicate a market price in a "but-for" world because "[t]he ultimate price of a product is a combination of market demand and market supply." *In re NJOY*, 120 F. Supp. 3d at 1119.

A failure to analyze "the 'supply' part of the supply/demand curve"

therefore necessarily renders a conjoint-based price premium analysis unreliable and invalid. *See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022) (a damages model that "examines only what consumers say they would be willing to pay" but "ignores the 'supply' part of the supply/demand curve" "does not actually calculate a market price premium."); *In re NJOY*, 120 F. Supp. 3d at 1119 ("A consumer's subjective valuation of the [challenged] message, measured by their relative willingness to pay for products with or without the message, is not an accurate indicator of [ ] damages, because it does not permit the court to calculate the true market price of [the product] absent the purported misrepresentations"); *In re Gen. Motors*, 407 F. Supp. 3d at 236 (a conjoint analysis that does not analyze defendant's willingness to sell at different price points "does not provide competent proof of damages.").

That is the situation here. Plaintiffs' model does not analyze the supply side at all. Instead, the model simply infers that any difference in demand ascertained by the conjoint survey equates directly to a price

decrease by assuming a constant sales volume. Put differently, the model assumes that Sazerac would reduce prices of Fireball Malt enough to maintain its current sales volume, even though the record shows that Sazerac would not and could not do that.

Dr. Ben-Akiva's "assumption that the seller under the 'but-for' scenario would not alter the product supply" and would instead lower prices (2-ER-290) may make computations easier, but it renders the methodology unreliable. Dr. Ben-Akiva provides no rationale for his assumption and there is no basis for it. *See, e.g.*, Rene Befurt *et al.*, *Supply Side Considerations When Using Conjoint Analysis in Litigation* (May 2024), https://mitsloan.mit.edu/shared/ods/documents?PublicationDocumentID=10240, at 39 (assuming that a seller "will supply exactly the same number of products in the 'but for' world as in the 'as is' world" is "a heroic assumption."). That constant-volume assumption is economically implausible. Take the situation where $4.75 is the cost of producing and distributing a breakfast cereal sold at retail for $5.00. A conjoint survey might suggest that demand for cereal would drop by 20 percent if the packaging no longer claimed "low sugar." No reasonable seller,

however, would reduce the price to $4.00 to maintain a constant sales volume and lose 75 cents on every sale. Instead, a rational seller would accept a lower sales volume and price the cereal above $4.75 to ensure a profit.[6]

Further, Dr. Ben-Akiva's assumption is inconsistent with the undisputed evidence before the district court that Sazerac *would not* and *could not* decrease the price of Fireball Malt, even if demand decreased. (3-ER-474)

First, Sazerac line-prices its spirit-based products (including Fireball Whisky) and malt-based products (including Fireball Malt). The suggested retail price of all 50 ml bottles of brands available in both malt-based and spirit-based versions is the same, despite different levels of demand for the individual brands, and that the suggested retail price of all 100ml bottles of brands available in both malt-based and spirit-based versions is the same, even though there are different levels of demand for different brands. (3-ER-473-74) In other words,

---

6 The assumption of a vertical supply curve also fails to account for the possibility that, in response to a drop in demand for the subject cereal, competing sellers increased their prices, making it possible for the seller of the subject cereal to *increase* the subject cereal's price and still gain market share.

Sazerac *maintains the same pricing regardless of changes in demand.*

Second, Sazerac faces constraints that prevent it from reducing the price of Fireball Malt even if demand were to fall. As explained by Sazerac's Executive Chairman:

[redacted]

(3-ER-474)

Third, Fireball Malt [redacted] Fireball Whisky. (3-ER-477)

The district court ignored this undisputed evidence. It also failed substantively to address the absence of supply-side analysis in Dr. Ben-Akiva's proposed methodology. Instead, the district court concluded

that Dr. Ben-Akiva had adequately accounted for supply-side factors because he proposed to use "actual market prices" in his conjoint survey and "actual quantities sold" to estimate damages. (1-ER-027) In doing so, the district court embraced a common misapprehension of supply-side factors that first appeared in *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018). In *Hadley*, the court erroneously concluded that "conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period." *Id.* at 1105. Here, the district court erred as a matter of law in adopting *Hadley*'s misapprehension of supply-side factors.

The use of "actual market prices" in conjoint survey choice sets may make the survey more realistic than if the survey used arbitrary and unrealistic prices in its choice sets, but, as noted above, a conjoint survey still only purports to estimate *demand*. Using "actual market

prices" in a conjoint survey says nothing at all about the supply side. Moreover, "actual market prices" reflect prices given the set of marketplace offerings in the actual world, whereas the stated objective of Dr. Ben-Akiva's proposed methodology is to determine prices in a but-for world in which the offerings are *different* than in the actual world. (2-ER-289) Without analyzing how prices would change in the but-for world, no price premium analysis is valid. *See, e.g.*, *In re NJOY*, 120 F. Supp. 3d at 1119.

Use of "actual quantities sold during the class period" likewise has nothing to do with the supply-side factors necessary to estimate a price in the but-for world; it is instead an unwarranted shortcut to *avoid* supply-side analysis by making the "heroic assumption" that a seller would sell the same quantity of products in the but-for world that it does in the real world.

The district court adopted the same mistaken premise here by allowing Dr. Ben-Akiva's promise to use "actual market prices" and "actual quantities" to obviate the need to analyze *any* true supply-side factors in the but-for world and to relieve Dr. Ben-Akiva of any obligation to consider the undisputed fact that Sazerac would not and

could not decrease prices for Fireball Malt in the but-for circumstance. Rather than requiring Plaintiffs to demonstrate "by a preponderance of the evidence, that the [damages] model will be able to reliably calculate damages in a manner common to the class at trial," *Lytle*, 114 F.4th at 1024, the district court effectively excused any requirement to analyze supply-side factors. That "convert[ed] what is properly 'an objective evaluation of relative fair market values into a seemingly subjective inquiry of what an average consumer wants.'" *In re NJOY*, 120 F. Supp. 3d at 1119 (quoting *Saavedra v. Eli Lilly and Co.*, No. 2:12–cv–9366, 2014 U.S. Dist. LEXIS 179088, at *14, 2014 WL 7338930 at *5 (C.D. Cal. Dec. 18, 2014)).[7]

Next, the district court quoted *In re General Motors* for the proposition that "a conjoint survey that asks respondents whether they would rather pay x for a product labeled "100% Fruit Juice" or y for a

[7] The district court sought to distinguish both *In re NJOY* and *Saavedra* on the ground that "[t]he conjoint analysis in those two lawsuits involved consumers' valuations of products that did not actually exist (i.e., what consumers would pay for an electronic cigarette in *In re NJOY* that included safety disclosures, and what consumers would pay for a prescription drug with more accurate withdrawal disclosures in *Saavedra*)." (1-ER-028) But that is precisely what Dr. Ben-Akiva claims to do here: estimate consumers' valuation of Fireball Malt with a label placing greater emphasis on "malt beverage."

similar product labeled "50% Fruit Juice," for example, would account for supply-side factors if both x and y reflect the prices for which juice companies actually sell similarly labeled products in the marketplace." *In re Gen. Motors*, 407 F. Supp. 3d at 239. It may be the case that if pricing data exists for the same product with two different labels, supply and demand would both be reflected in the real-world prices for the two variants of that product. But that situation does not exist here, where *x* (the average retail price of Fireball Malt with the existing label) is known, but *y* (the price of Fireball Malt with a label stating "malt beverage" more prominently) is not.

Finally, the district court again retreated to the position that Dr. Ben-Akiva's failure to consider supply-side factors "goes to weight, not admissibility." (1-ER-028) As discussed above, this falls short of a district court's obligation to conduct a "rigorous analysis" to ensure that a damages model "will be able to reliably calculate damages in a manner common to the class at trial." *Lytle*, 114 F.4th at 1024. Because Plaintiffs' methodology is bereft of any analysis of supply-side factors, it cannot reliably calculate damages. Any measurement would be entirely "arbitrary." *Comcast*, 569 U.S. at 36. The district court

therefore erred as a matter of law in certifying the class.

## CONCLUSION

The district court was required to conduct a "rigorous analysis" to ensure that Plaintiffs' damages model "will be able to reliably calculate damages in a manner common to the class at trial." It failed to do so. Because damages cannot be established in a manner common to the class, this Court should reverse the district court's class certification order and direct the district court to proceed only with respect to the named plaintiffs.

Respectfully submitted this 23rd day of March, 2026.

DORSEY & WHITNEY LLP

/s/ Creighton R. Magid
Creighton R. Magid
1401 New York Avenue, NW
Suite 900
Washington, DC 20005
Telephone: (202) 442-3555

QUINN EMANUEL URQUHART & SULLIVAN, LLP
John Bash
300 W. 6th Street
Austin, TX 78701
Telephone: (737) 667-6100

*Attorneys for Appellant Sazerac Company, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,787 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated this 23rd day of March, 2026.

/s/ Creighton R. Magid
Creighton R. Magid

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 23, 2026.

I certify that all participants in the case are registered users and that service will be accomplished by the appellate CM/ECF system.

/s/ Creighton R. Magid
Creighton R. Magid