REDACTED

**No. 25-4833**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

TERRY MYERS AND DAWN OUTLAW,

*Plaintiffs-Appellees,*

v.

SAZERAC COMPANY, INC.,

*Defendant-Appellant.*

---

ON APPEAL FROM THE U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 3:23-CV-522-EMC
HON. EDWARD M. CHEN

---

# APPELLANT'S REPLY BRIEF

---

DORSEY & WHITNEY LLP
Creighton R. Magid
1401 New York Ave., NW
Suite 900
Washington, DC 20005
Telephone: (202) 442-3555

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Daniel Lombard
191 N. Wacker Dr. #2700
Chicago, IL 60656
Telephone: (737) 667-6100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
John Bash
300 W. 6th Street
Austin, TX 78701
Telephone: (737) 667-6100

Dylan C. Bonfigli
865 S. Figueroa St., 10th Fl.
Los Angeles, California 90017
Telephone: (213) 443-3000

*Attorneys for Defendant-Appellant Sazerac Company, Inc.*

# TABLE OF CONTENTS

**Page**


INTRODUCTION .......... 1

STANDARD OF REVIEW .......... 2

ARGUMENT .......... 2

I. THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD TO THE DAMAGES MODEL .......... 2

A. *Comcast* Requires A Finding That A Damages Model Will Reliably Calculate Classwide Damages .......... 2

B. The District Court Did Not Ensure That The Damages Model Will Reliably Measure Classwide Damages .......... 4

C. The District Court's "Even If Excluded, Damages Would Be Zero" Rationale Is Legal Error .......... 7

II. THE DAMAGES MODEL CANNOT RELIABLY MEASURE A PRICE PREMIUM .......... 10

A. The Proposed Survey Population Renders Plaintiffs' Model Incapable of Reliably Measuring Demand .......... 11

B. Changing Retail Scenarios Does Not Reliably Measure The Value Of Convenience .......... 17

C. Plaintiffs' Model Fails To Address The Supply-Side .......... 22

CONCLUSION .......... 33

# TABLE OF AUTHORITIES

**Page**

## Cases

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................ 1, 2, 3, 8, 7, 9, 11

*Earl v. Boeing Co.*,
53 F.4th 897 (5th Cir. 2022) ........................................ 24

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) .......... 1, 3, 4, 5, 6, 15, 16, 17, 21, 28, 29

*In re General Motors LLC Ignition Switch Litig.*,
427 F. Supp. 3d 374 (S.D.N.Y. 2019) ........................................ 31, 32

*In re General Motors LLC Ignition Switch Litig.*,
407 F. Supp. 3d 212 (S.D.N.Y. 2019) ........................................ 29, 30, 31

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ........................ 22, 25, 26, 28, 31

*Kudos Inc. v. Kudoboard LLC*,
2021 WL 5415258 (N.D. Cal. Nov. 20, 2021) ................................ 13, 15

*Lytle v. Nutramax Laboratories, Inc.*,
114 F.4th 1011 (9th Cir. 2024) ..................................... 1, 2, 3, 7, 10, 16

*Maldonado v. Apple, Inc.*,
2021 WL 1947512 (N.D. Cal. May 14, 2021) ........................................ 28

*Mier v. CVS Health*,
2023 WL 4837851 (9th Cir. July 28, 2023) ...................... 23, 24, 25, 31

*In re NJOY, Inc. Consumer Class Action Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015) ........................................ 29, 31

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ........................................ 27

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
752 F.3d 807 (9th Cir. 2014)....................................................6

*S. Crow Collateral Corp. v. United States*,
782 F. App’x 597 (9th Cir. 2019)...............................................5

*Simpson Strong-Tie Co. v. MiTek Inc.*,
2023 WL 137478 (N.D. Cal. Jan. 9, 2023)...................................17

*Smith v. Agdeppa*,
81 F.4th 994 (9th Cir. 2023) ....................................................13

*United States v. Valencia-Lopez*,
971 F.3d 891 (9th Cir. 2020)......................................................7

*Vision Sports, Inc. v. Melville Corp.*,
888 F.2d 609 (9th Cir. 1989)......................................................17

*Zakaria v. Gerber Prods. Co.*,
755 F. App'x 623 (9th Cir. 2018)........................................21, 27, 30, 31

**Other Authorities**

Fed. R. Civ. P. 23.......................................................................2, 9

Fed. R. Civ. P. 23(b)(3) ..................................................................9

Fed. R. Evid. 104(a)......................................................................21

Fed. R. Evid. 702 ..........................................1, 2, 3, 4, 6, 16, 17, 21, 28, 31

Fed. R. Evid. 702(b)......................................................................14

Fed. R. Evid. 702(d)....................................................................6, 14

# INTRODUCTION

Plaintiffs concede the governing rule: Before certifying a class based on an unexecuted damages model, the district court had to find, by a preponderance of the evidence, that the model would reliably calculate damages in a manner common to the class. Answering Br. ("AB") 13. The certification order did not conduct the inquiry that Rule 702 requires. It treated exclusion as exceptional, asked whether Plaintiffs' damages model amounted to "junk science," accepted disputed assumptions because they were not "indisputably wrong," and reasoned that exclusion would merely produce a common damages award of zero. Each step is foreclosed by *Engilis v. Monsanto Co.*, 151 F.4th 1040 (9th Cir. 2025), *Lytle v. Nutramax Laboratories, Inc.*, 114 F.4th 1011 (9th Cir. 2024), and *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

The answering brief cannot explain away those errors. Counting the pages in the certification order and repeating the district court's recitation of the correct standard cannot substitute for missing reliability findings. The record confirms that Plaintiffs' model cannot reliably measure the alleged price premium: Its survey population is not

shown to represent the Fireball Malt market; its choice sets never require respondents to value convenience against the other attributes; and it converts a purported demand shift into a price premium by assuming—contrary to the empirical evidence—that historical sales quantities would remain fixed in the but-for world. The certification order should be reversed.

## STANDARD OF REVIEW

Plaintiffs concede (AB 18) that failure "to perform the Rule 702 analysis required by *Daubert*, amended Rule 702, and *Lytle* … would present a legal error warranting *de novo* review." That is this appeal: although the district court recited the governing law, it did not perform the required reliability analysis. Because abuse-of-discretion review presupposes application of "the correct legal standard" (AB 13), review is *de novo*.

## ARGUMENT

### I. THE DISTRICT COURT APPLIED THE WRONG LEGAL STANDARD TO THE DAMAGES MODEL

#### A. *Comcast* Requires A Finding That A Damages Model Will Reliably Calculate Classwide Damages

Plaintiffs concede (AB 13) that "Sazerac correctly identifies the governing legal standards under Rule 23, amended Rule 702, and

*Comcast*." As Sazerac explained, those authorities required that Plaintiffs demonstrate, by a preponderance of the evidence, that their unexecuted damages model "will be able to reliably calculate damages in a manner common to the class at trial." Opening Br. ("OB") 14. The district court could not abdicate its role as gatekeeper and was instead required to "probe the likelihood that the model will be capable of generating common answers." *Lytle*, 114 F.4th at 1031.

Under *Engilis*, challenges to an expert's factual basis or application of methodology go to weight only after the court finds it more likely than not that the opinion has a sufficient basis. 151 F.4th at 1049. Only "[i]f the proposed testimony meets the thresholds of relevance and reliability" may the jury assess credibility and weight. *Id.* at 1050. "There is no presumption in favor of admission." *Id.* at 1049. Because Rule 702 requires a sufficient factual foundation, "the 'key inquiry' is whether an expert had sufficient factual grounds on which to draw conclusions." *Id.* at 1051.

Finally, "[t]he district court's 'responsibility to screen expert testimony' encompasses the requirement that expert testimony be 'based on sufficient facts or data.'" *Engilis*, 151 F.4th at 1051 (citation

omitted). "This element 'requires foundation.'" *Id.* "The 'key inquiry' is whether an expert had sufficient factual grounds on which to draw conclusions." *Id.*

### B. The District Court Did Not Ensure That The Damages Model Will Reliably Measure Classwide Damages

Here, the certification order reflects the presumptions that *Engilis* disapproved. The district court stated that "the rejection of expert testimony is the exception rather than the rule." 1-ER-8. That is contrary to *Engilis*'s instruction that "[t]here is no presumption in favor of admission." 151 F.4th at 1049. The district court characterized its gatekeeping role as limited to excluding "junk science" (1-ER-8) and proceeded to ask whether Plaintiffs' damages model rose to the level of "junk science" (1-ER-22). But that is contrary to Rule 702 and *Engilis*'s direction that ***all*** expert testimony must satisfy "the admissibility requirements of Rule 702." 151 F.4th at 1050.

Plaintiffs have no response to *Engilis*. Although Sazerac repeatedly cited the case (OB 15, 19, 20), Plaintiffs do not mention it in their answering brief. Nor do they grapple with the inconsistencies between *Engilis* and the district court's analysis.

Plaintiffs instead argue (AB 13, 15) that the order necessarily

applied the correct standard because it recited Plaintiffs' preponderance burden, discussed Rule 702 and *Daubert*, and recognized its gatekeeping role. But reciting the standard cannot insulate reasoning that applies a different one. *See, e.g.*, *S. Crow Collateral Corp. v. United States*, 782 F. App'x 597, 599 (9th Cir. 2019) (applying *de novo* review where the district court recited the correct standard but its order did not clearly apply it).

Here, the certification order's own language confirms that it applied a less demanding standard than the one it recited. The order hypothesized that "[i]ncluding both Malt and Whisky drinkers in the target population ***may be*** appropriate" (1-ER-22) (emphasis added), stated that surveying individuals who had previously purchased Fireball products "would appear to account for brand loyalty" (1-ER-22-23), and ultimately deemed the target population "sufficiently appropriate to pass *Daubert*" because the survey did not amount to "junk science" (1-ER-22). In doing so, the district court failed to ensure that Dr. Ben-Akiva would have "sufficient factual grounds on which to draw conclusions." *Engilis*, 151 F.4th at 1051.

Plaintiffs misplace reliance (AB 16) on the order's statements that

it was "reasonable to use" the proposed survey population (1-ER-23) and that conjoint surveys like Plaintiffs' "have … been deemed reliable" (1-ER-28). Neither is the reliability finding that Rule 702 required. The first rested on the premise that Sazerac had not shown Dr. Ben-Akiva's assumptions to be "indisputably wrong." 1-ER-8. The burden, however, is on ***Plaintiffs*** to establish that the proposed population would permit reliable inferences about the Fireball Malt market. *See Engilis*, 151 F.4th at 1051. The second addressed the general acceptance of conjoint methodology—not whether Dr. Ben-Akiva reliably applied that methodology, as Rule 702(d) requires.[1]

The certification order's reasoning does not resolve the critical questions of (1) whether the survey's target population will be representative enough to permit reliable extrapolation to the class and (2) whether Dr. Ben-Akiva's methodology could reliably calculate a price

[1] Plaintiffs cite *Pyramid Technologies, Inc. v. Hartford Casualty Insurance Co.*, 752 F.3d 807, 814 (9th Cir. 2014) (AB 16), to argue that Sazerac's objections go to weight, not admissibility. *Pyramid Technologies*, however, confirms that challenges are to be treated as matters of weight only after establishing that expert testimony is admissible. *Id. Engilis* confirms that the threshold finding cannot be inferred from the court's subsequent characterization of an objection as one of weight. 151 F.4th at 1049-50.

premium. Rule 702 and *Lytle* required those reliability determinations. 114 F.4th at 1024. *Comcast* separately required a methodology capable of measuring damages attributable to Plaintiffs' liability theory on a classwide basis. 569 U.S. at 34. The district court legally erred by failing to make those findings. Simply "dismissing an argument as 'going to … weight, not admissibility,'"—as the district court repeatedly did (1-ER-16; 1-ER-23; 1-ER-28-29)—"is *not* a reliability determination." *United States v. Valencia-Lopez*, 971 F.3d 891, 899 (9th Cir. 2020).

### C. The District Court's "Even If Excluded, Damages Would Be Zero" Rationale Is Legal Error

The district court also conducted its class-certification analysis under an erroneous premise: even if Plaintiffs' sole damages model were excluded under *Daubert*, predominance would be satisfied because the resulting zero-damages determination would apply uniformly to the class. *See* OB 17-18 & n.3. The district court announced that premise at the outset of its analysis. After stating that it was "not required to evaluate whether the survey will ultimately *prove* Plaintiffs' claim for damages" (1-ER-14), the court explained that—even "if Dr. Ben-Akiva's opinion on the magnitude of damages ... is excluded under *Daubert*," thus "diminish[ing] or eliminat[ing] [the] claim for money damages"—

the "resolution of damages would be common to the class" (1-ER-15).

The court repeated that erroneous reasoning. It stated that even if the survey were excluded, damages could still "be found to be $0" on a classwide basis (1-ER-18) and, later, that exclusion "would only inform the amount of damages" because the "ultimate decision, whatever it is, would still apply to the entire class" (1-ER-41). Plaintiffs do not defend those propositions. They instead call them "two isolated statements … divorced from the analysis." AB 17.

The statements were neither isolated nor immaterial. The first expressly preceded "the merits of the *Daubert* challenge" (1-ER-18), framing the ensuing analysis by treating reliability disputes as immaterial to predominance: admission or exclusion would produce a classwide answer. The second appeared in the final predominance analysis. After declining to revisit Sazerac's objections "in depth" because it had rejected them under *Daubert* (1-ER-39), the court stated that exclusion would not affect predominance because the result would apply classwide (1-ER-41). The court then immediately concluded that Plaintiffs had supplied a *Comcast*-compliant model. *Id.* The zero-damages rationale thus framed and concluded the court's analysis; it

cannot fairly be dismissed as unrelated commentary.

The conclusion that the district court's statements amounted to legal error follows directly from *Comcast*. Where, as here, plaintiffs rely on a damages model to establish predominance (AB 9), they must show that "damages are capable of measurement on a classwide basis" through a methodology tied to the asserted injury. *Comcast*, 569 U.S. at 34. It is not enough that the same arbitrary or invalid method could be applied to everyone: *Comcast* expressly rejected the proposition that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be"—because that approach "would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.* at 36.

The district court's approach would produce exactly the nullification that *Comcast* forbids. *Id.* Whenever a plaintiff's sole damages methodology was unreliable or inadmissible, its rejection would necessarily affect the entire class and yield a common recovery of zero. If that common failure were enough, no defects in a proposed damages model—however foundational—could defeat predominance. Rule 23 instead required Plaintiffs to establish affirmatively, as a

condition of certification, that their proposed model was a reliable and workable means of generating common damages answers. *See Lytle*, 114 F.4th at 1024. The district court's contrary premise was legal error.

Nor can the order's scattered descriptions of aspects of the model as "reasonable" (1-ER-17) or "sufficiently appropriate" (1-ER-23) supply the missing reliability determination. Those statements were made within an erroneous framework under which exclusion of the model had no bearing on predominance. Accordingly, they cannot substitute for the required finding that Plaintiffs proved the model's reliability by a preponderance of the evidence.

## II. THE DAMAGES MODEL CANNOT RELIABLY MEASURE A PRICE PREMIUM

Plaintiffs' damages model does not reliably measure any price premium that purchasers of Fireball Malt paid during the class period. Plaintiffs propose first to use a conjoint survey to estimate whether alternative Fireball Malt labeling would reduce demand for the product. They then equate any estimated demand change with a price change by holding sales volume constant. Neither step is reliable: the survey does not reliably measure demand among the relevant consumers, and the fixed-quantity assumption does not reliably translate any demand

change into a but-for market price.

### A. The Proposed Survey Population Renders Plaintiffs' Model Incapable of Reliably Measuring Demand

A damages methodology is invalid if it "identifies damages that are not the result of the wrong." *Comcast*, 569 U.S. at 37. Here, the gravamen of Plaintiffs' claim is that the current Fireball Malt labels mislead buyers into believing that they are buying Fireball Whisky and thereby permit Sazerac to charge more for Fireball Malt than it could if consumers understood that the product was a malt beverage. 2-ER-271-72 ¶ 6, 289 ¶ 50. Yet Plaintiffs do not attempt to test the reactions of Fireball Malt consumers to an alternative label.[2] Instead, Plaintiffs seek to compare consumers' relative valuations of whisky and malt beverages.

There is no dispute, however, that there is a mismatch between

---

[2] The failure to test consumer reactions to ***labels***—the crux of Plaintiffs' case—itself constitutes a failure to propose a method of calculating damages that are "the result of the wrong." *Comcast*, 569 U.S. at 37. Plaintiffs do not propose to compare consumers' willingness to pay for Fireball Malt with a revised label with their willingness to pay for Fireball Malt with the existing label. Instead, they propose to compare valuations of "whisky" and "malt." Such an approach fails to address whether the ***labeling*** has any impact on consumer valuations.

Plaintiffs' proposed class and the individuals who would be surveyed for Plaintiffs' conjoint survey: Plaintiffs' class consists of Fireball Malt purchasers (1-ER-2), yet the survey screens only for consumers who purchased "any Fireball product" (2-ER-284 ¶ 39).

That survey population is likely to be dominated by Fireball ***Whisky***-only purchasers because [redacted] 3-ER-477 ¶ 23. Moreover, [redacted]. 3-ER-456 ¶ 9; 3-ER-464. Plaintiffs do not genuinely dispute this evidence.

This mismatch matters because the valuations of Fireball Whisky purchasers cannot be assumed to reflect the valuations of Fireball Malt buyers. The two groups exhibit [redacted] 3-ER-456 ¶¶ 9-11; 3-ER-464-65. Sazerac's expert explained that [redacted] 3-ER-362-63 ¶¶ 28-29; 3-ER-375-76 ¶¶ 52-55. Thus, the preferences of Whisky-only purchasers cannot reliably establish the preferences of actual or likely Fireball Malt purchasers absent evidence that the two groups are comparable. Plaintiffs offered none. *See, e.g.*,

*Kudos Inc. v. Kudoboard LLC*, 2021 WL 5415258, at *12 (N.D. Cal. Nov. 20, 2021) (excluding survey whose sample did not capture a representative population of consumers most likely to purchase the product at issue).[3]

Plaintiffs respond (AB 19) that Sazerac "conflates the class definition with the appropriate survey population." Not so. As Plaintiffs themselves acknowledge (*id.*), a conjoint survey must "identif[y] the population whose preferences determine demand for the product."

The relevant population consists of actual or likely Fireball Malt purchasers—not consumers with no meaningful likelihood of buying the product. The damages question here is what those consumers would have paid for relabeled Fireball Malt (2-ER-272 ¶ 7(c); 2-ER-289 ¶ 50)—not what those who have not and would not purchase that product would have paid for it. By including Whisky-only purchasers without

---

[3] Plaintiffs assert (AB 21), without citing any record evidence, that Fireball Whisky purchasers are "the consumers most likely" to purchase Fireball Malt and that any contrary conclusion "strains credulity." Counsel's say-so is no substitute for evidence—particularly where the record evidence points in the opposite direction. *See, e.g.*, *Smith v. Agdeppa*, 81 F.4th 994, 1002 (9th Cir. 2023) (rejecting an assertion "based not on expert analysis, but on the speculation of counsel," and reiterating that "the arguments and statements of counsel are not evidence").

demonstrating that they are likely Fireball Malt purchasers or are representative of Fireball Malt purchasers, Plaintiffs cannot reliably determine whether an alternative Fireball Malt label would have any effect on demand for the product.

Plaintiffs attack a strawman by arguing (AB 4) that Sazerac's survey-population objection depends on proving that Fireball Malt and Fireball Whisky purchasers are "mutually exclusive." The district court adopted the same framing, reasoning that "[i]t is not undisputed, as Sazerac contends, that malt and whiskey drinkers are mutually exclusive." 1-ER-22. On this basis, the district court concluded that "[t]he target population ***may*** be appropriate" and that any "imprecision and its effect on the accuracy of the survey is a matter for cross examination and goes to the weight of the expert testimony." 1-ER-22-23 (emphasis added).

Plaintiffs' argument, and the district court's analysis, inverts the burden of proof. It is not for Sazerac to prove the extent of mismatch between Plaintiffs' survey population and actual or likely Fireball Malt purchasers; ***Plaintiffs*** have the burden of showing that their chosen population is sufficiently representative to permit reliable inferences

about demand for Fireball Malt with alternative labeling. *See* Fed. R. Evid. 702(b), (d); *Engilis*, 151 F.4th at 1049-50; *Kudos*, 2021 WL 5415258, at *12.

Plaintiffs proffered no evidence that the survey population reflects the views of Fireball Malt purchasers. Although survey respondents must have purchased a Fireball product and must also have purchased some alcoholic beverage at a convenience store or similar retailer (2-ER-284 ¶ 39), that screening criterion does not require a Fireball Malt purchase: a Fireball Whisky buyer who happened to buy a beer at a convenience store within the past year would qualify. Because the overwhelming majority of Fireball sales in California are of Fireball Whisky and because [redacted] Plaintiffs' population will overwhelmingly reflect the views of Fireball Whisky buyers, not likely Fireball Malt buyers. 3-ER-456 ¶ 9; 3-ER-477 ¶ 23; 3-ER-464. On this record, Plaintiffs did not carry their burden to establish that the proposed survey population represents the relevant market.

Under *Engilis*, this is not merely a disagreement for cross-examination. Whether the chosen population supplies a sufficient

factual basis and whether the conjoint methodology is reliably applied to that population are threshold Rule 702 questions. *Engilis*, 151 F.4th at 1049-51. And under *Lytle*, the district court had to determine whether the proposed model would likely generate a reliable common answer when applied to the facts of this market. 114 F.4th at 1031-32. The district court did not make that determination; it merely observed that some consumers might purchase both products. 1-ER-22.

Contrary to Plaintiffs' assertions (AB 8-9, 21), neither Sazerac's website FAQs (1-SER-2-9) nor evidence of consumer complaints addresses the problem. The FAQs document states that Fireball Malt was developed for consumers who wanted the Fireball brand and "taste experience" in a "wider variety of convenient shopping locations." 1-SER-3. This in no way suggests that every Fireball Whisky purchaser is a likely Fireball Malt purchaser or that Whisky-only purchasers are representative of Fireball Malt purchasers. Likewise, complaints allegedly showing that some consumers were confused by Fireball Malt do not show that the views of Whisky-only purchasers can reliably represent the views of Fireball Malt consumers.

Plaintiffs' survey-universe authorities (AB 22-23) are also

inapposite. These cases merely hold that whether a survey population is "optimal" is an issue of weight, provided that the selected population nonetheless produces probative and reliable results. *See, e.g.*, *Simpson Strong-Tie Co. v. MiTek Inc.*, 2023 WL 137478, at *3-4 (N.D. Cal. Jan. 9, 2023) (ruling that whether "a *better* survey universe could have been selected" was a question of weight because the survey was reliable and probative); *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (holding that an underinclusive consumer-recognition survey nevertheless supported a finding of secondary meaning because its results were sufficiently reliable). The problem here is foundational: Plaintiffs offered no reliable basis for extrapolation from their proposed population to Fireball Malt purchasers. Following amended Rule 702 and *Engilis*, that concerns the sufficiency of the model's basis and its reliable application—not merely weight.

### B. Changing Retail Scenarios Does Not Reliably Measure The Value Of Convenience

Convenience is not peripheral to Fireball Malt demand—it is central to consumers' purchasing decisions. Market evidence shows that [redacted] that "[redacted],

and that [redacted]. 3-ER-383 ¶¶ 66-67; 3-ER-470.

Plaintiffs' purchases confirm the point. Dawn Outlaw purchased Fireball Malt while stopping for gas after seeing it displayed beside the register. 2-ER-81. Terry Myers purchased six bottles each week at a Chevron because "[i]t was just convenient" and "there when [he] wanted it"; he described the transaction as "two seconds, in and out" and explained that the value of his time justified paying $4 for Tums at Chevron rather than spending an hour to obtain the same product for 99 cents at Walmart. 2-ER-89-94.

Myers's testimony demonstrates the tradeoff that Plaintiffs' model does not consider: Myers valued immediate availability enough to pay approximately four times the price available elsewhere. *Id.* Plaintiffs' model merely addresses relative preferences for "whisky" or "malt" in the abstract. Because the choice sets do not address the convenience difference between Fireball Malt and Fireball Whisky, Plaintiffs' survey is incapable of reliably determining whether a label more emphatically proclaiming Fireball Malt to be a malt beverage would make any

difference to Fireball Malt consumers' purchasing decisions.

A model purporting to measure a "price premium" therefore must capture the tradeoff that consumers actually face: Fireball Malt available where they already shop versus Fireball Whisky that may require a separate trip to a retailer licensed to sell spirits. *See* 1-ER-5; 3-ER-499-500. Plaintiffs' proposed conjoint survey does not do so.

There is no dispute that convenience is absent from the six attributes in Plaintiffs' proposed conjoint survey. 2-ER-286-87 ¶ 43. Survey respondents will not be asked to make the tradeoff that consumers confront in the real world—between alcohol type, product availability, and the convenience of purchasing Fireball Malt where they already shop. *See* 2-ER-91-94. That omission matters: excluding convenience renders the results meaningless with respect to consumers' valuation of Fireball Malt and risks distorting the attributes the survey does include, such as alcohol type. 3-ER-384-385 ¶¶ 68-71.

Far from curing that omission, Plaintiffs' proposed retail scenarios compound it. Dr. Ben-Akiva will omit Fireball Whisky from convenience store choice sets, and he will omit Fireball Malt from liquor-store choice sets. 2-ER-287-88 ¶ 45; 3-ER-386-87 ¶¶ 73-76. Survey respondents

therefore will never confront the relevant real-world tradeoff between convenience, price, and base alcohol—because the choice sets will assume that respondents are at the stores where the products are available in the real world. 3-ER-382 ¶ 64; 3-ER-382-83 ¶ 66. By assuming away the importance of convenience, Plaintiffs render their proposed model unreliable.

Plaintiffs' contrary assertion is unsupported. Without citing any evidence, Plaintiffs declare (AB 25) that "[c]onsumers purchasing an alcoholic beverage necessarily care about the identity of the product they are buying—including whether it is whisky or a malt beverage and its alcohol content." Not only does that merely assume the results of the proposed conjoint survey, but it is beside the point. The relevant question is not whether consumers care about alcohol type in the abstract but whether convenience and immediate availability outweigh and render unimportant the type of base alcohol. Only a survey that presents those competing considerations together can measure that tradeoff. Plaintiffs' proposed survey does not. Despite accusing Sazerac of "misstat[ing] Plaintiffs' methodology" (AB 24), Plaintiffs never dispute that the proposed survey in no way presents that core tradeoff

to survey respondents.

Plaintiffs' further argument that this fundamental flaw is merely an issue of weight (AB 26-27) lacks merit, as *Engilis* and the 2023 amendment to Rule 702 make clear. The cases cited by Plaintiffs all predate the 2023 amendment to Rule 702 and employ the precise weight-versus-admissibility reasoning that the 2023 amendment and *Engilis* reject when it substitutes for the threshold finding required by Rules 702 and 104(a). As the advisory committee explained with respect to the 2023 amendment to Rule 702, opinions holding "that crucial questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility … are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 Advisory Committee Note to 2023 Amendments.

Moreover, this Court's authority supports Sazerac. *Zakaria v. Gerber Products Co.* held that a damages methodology based on consumer willingness to pay must reflect "marketplace realities that would affect product pricing." 755 F. App'x 623, 624-25 (9th Cir. 2018). Fireball Malt's greater convenience affects consumers' willingness to pay—as Plaintiffs' own testimony demonstrates. 2-ER-81; 2-ER-89-94.

By ignoring and assuming away the role of convenience, Plaintiffs' proposed methodology is simply incapable of answering the question whether demand would change at all with a different label under real-world marketplace conditions.

### C. Plaintiffs' Model Fails To Address The Supply-Side

Plaintiffs acknowledge that "market prices are a result of a combination of market demand and market supply." AB 28 (quoting *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1104 (N.D. Cal. 2018)). Plaintiffs also concede that, without analyzing the supply side, a conjoint survey "measures only a shift in demand-side willingness-to-pay as a result of a label change, but not a market price premium." *Id.*

That concession highlights a second fatal shortcoming in Plaintiffs' damages model: Plaintiffs' theory requires proof that changing Fireball Malt labels to emphasize "malt beverage" more emphatically would have resulted in a lower market price. 2-ER-109, 111. But because market price is determined by the interaction of demand ***and supply***, that counterfactual cannot be established through a demand-side survey alone. It requires a reliable analysis of how both consumers ***and suppliers*** would have acted in the but-for market.

Dr. Ben-Akiva, however, admits that his methodology includes no supply-side analysis. Instead, he assumes that "[t]he supply situation … remain[s] unchanged." 2-ER-289 ¶ 51. In his words: "Demand will be predicted to change because of the elimination of the [alleged] deception, ***supply quantities will remain the same***, and the change in equilibrium price of the malt product will be the estimate of the price premium." 2-SER-21-22 ¶ 30 (emphasis added). That is, by assuming that supply remains constant, Dr. Ben-Akiva concludes that, if demand for Fireball Malt would fall with a new label, Sazerac would reduce prices to maintain a constant sales volume. 2-SER-21-22 ¶ 30. But Dr. Ben-Akiva identifies no empirical support for holding supply quantities fixed and proposes no analysis to test whether that assumption is valid. *Id.*

Indeed, Dr. Ben-Akiva's assumption is contrary to the record evidence, which establishes that Sazerac line-prices its ready-to-drink products regardless of differences in demand across brands and that, to preserve its spirits business, Sazerac would not lower the price of Fireball Malt even if demand were to drop. 3-ER-473-74 ¶¶ 5-10.[4]

---

[4] As this Court observed in *Mier v. CVS Health*, 2023 WL 4837851,

Plaintiffs do not simply fail to analyze the supply side; they completely ignore Sazerac's business strategy. Without properly modeling the supply side in the hypothetical but-for world in which Fireball Malt has a different label, Plaintiffs are incapable of calculating a price in the but-for world. Without such a price to compare with historical prices, there can be no evidence of a price premium.

This Court has rejected the same fixed-supply shortcut in a nonprecedential opinion. In *Mier v. CVS Health*, the plaintiffs' conjoint model purported to establish a price premium by measuring changes in consumer demand while assuming actual-world supply. 2023 WL 4837851, at *1-2. This Court held that the conjoint model was properly excluded because it did not account for "how a change in market demand from removing the statement would affect market supply." *Id.* at *1. That accords with the analysis of the Fifth Circuit in similar factual circumstances. *See Earl v. Boeing Co.*, 53 F.4th 897, 902-03 (5th Cir. 2022) (conjoint evidence that disclosure of a defect would reduce consumer demand did not establish a price premium where plaintiffs

---

at *1 (9th Cir. July 28, 2023), such evidence "could reasonably suggest there was no price premium at all."

assumed, without accounting for supplier responses, that supply would remain unchanged). As in *Mier* and *Boeing*, Plaintiffs' failure to evaluate the supply side of the pricing equation means that their methodology cannot reliably calculate classwide damages.

Plaintiffs attempt to sidestep this defect by asserting (AB 27) that their model accounts for supply because it uses "actual market prices" and "actual quantities of products sold during the class period." But historical prices and quantities only account for supply in the empirical world; they do not address supply in the counterfactual, but-for market in which Fireball Malt has a different label. A price premium requires comparing the actual price with the but-for market price, and the latter must reflect both demand ***and supply*** in the but-for market. Actual prices may inform the price levels shown to survey respondents, and historical sales may be used to aggregate damages after a valid per-unit premium has been established. Neither substitutes for analyzing how quantity supplied would respond to the hypothesized change in demand.

Plaintiffs misplace reliance on *Hadley* and other nonbinding cases employing the same reasoning (AB 28-29). These cases conflate two

distinct inquiries: (1) calculating market price in the but-for world and (2) calculating damages once a price premium has been established. The first inquiry requires determining the equilibrium produced by the interaction of supply and demand in the but-for market. Historical prices and historical sales volume say nothing about how sellers would respond to the hypothesized change in demand.

The reasoning in *Hadley* and similar cases involves the economically implausible assumption that a seller would maintain historical sales volume even if that meant pricing below cost. Suppose a product sells for $2.00, costs $1.75 per unit, and the demand model estimates that maintaining historical volume after relabeling would require a price of $1.50. The reasoning from *Hadley* would lead to the implausible assumption that the seller would willingly lose 25 cents on every unit to preserve historical volume.

To be clear, Sazerac does not contend that a defendant seller can defeat damages merely by saying that it would not have lowered its prices. *Cf.* AB 31-32. Rather, the point is that consumer willingness to pay—what Dr. Ben-Akiva seeks to measure (AB 30)—does not itself establish the price that would have prevailed in a but-for market.

Moreover, it is undisputed that Sazerac line-prices its ready-to-drink products (3-ER-473 ¶ 6), meaning Sazerac has demonstrated historically that its pricing is not tied to demand, because its various brands all have different demand curves.[5]

Dr. Ben-Akiva's failure to analyze the supply side is not excused by this Court's statement in *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (AB 32), that the proper measure of damages in a consumer deception case is "the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the [deception]." In *Pulaski*, the plaintiffs' damages model accounted for supply-side considerations because "the plaintiffs proposed to measure damages via Google's own algorithm for setting the price of advertising space." *Zakaria*, 755 F. App'x at 625 (citing *Pulaski*, 802 F.3d at 989). Thus, *Zakaria*, applying *Pulaski*, confirmed that willingness-to-pay methods must "reflect supply-side considerations and marketplace realities that would affect product

---

[5] Sazerac recommends the same retail prices—[redacted] for brands offered in both malt- and spirit-based versions, even though demand differs among the various brands. 3-ER-473-74 ¶¶ 5-10.

pricing." *Id.* at 624. *Pulaski* does not eliminate the need for a supply-side analysis.

*Hadley* and nearly all the other cases Plaintiffs invoke in response to Sazerac's supply-side argument (AB 28-29) antedate the 2023 amendment to Rule 702, and they all predate *Engilis*. These decisions rejected supply-side challenges on the now-discredited ground that they concern only weight, not admissibility. That reasoning is no longer valid after *Engilis* and the 2023 amendment to Rule 702.

Plaintiffs next quote *Maldonado v. Apple, Inc.,* 2021 WL 1947512, at *22 (N.D. Cal. May 14, 2021) (AB 34-35), to raise the specter that adequate evaluation of the supply side in the but-for world could devolve into disputes over "myriad, unspecified market realities." No such issue is presented here. First, this is not a dispute over whether Dr. Ben-Akiva considered every conceivable market factor; he proposes ***no*** supply-side analysis at all and simply assumes constant quantity. Second, Sazerac identified concrete defects and concrete omitted evidence: Dr. Ben-Akiva's unsupported fixed-quantity assumption; Sazerac's line-pricing policy; and Sazerac's need to avoid undercutting its spirits distributors. More fundamentally, Rule 702 places the burden

***on Plaintiffs*** to establish that their damages model can reliably establish a price premium. *Engilis*, 151 F.4th at 1049-50. Plaintiffs, who plan to conduct ***no*** supply-side analysis, cannot avoid that burden by claiming that including ***all*** potential supply-side factors in a model might be too difficult.

Plaintiffs fare no better in attempting to distinguish *In re NJOY, Inc. Consumer Class Action Litigation*, 120 F. Supp. 3d 1050, 1119-22 (C.D. Cal. 2015), and *In re General Motors LLC Ignition Switch Litigation*, 407 F. Supp. 3d 212, 234-39 (S.D.N.Y. 2019) ("*GM*") (AB 31-32). Plaintiffs assert (AB 31), as did the district court, that the plaintiffs in *NJOY* "sought to measure consumers' willingness to pay for a hypothetical product that had never existed in the marketplace." That distinction is illusory: Plaintiffs' own but-for product—Fireball Malt with different labeling—does not exist in the marketplace, either.

Moreover, the absence of an existing but-for product was not the focus of the court's attention in *NJOY*. Rather, *NJOY* rejected the proposed analysis because it measured only consumers' subjective willingness to pay while "completely ignor[ing]" the manufacturer's willingness to sell, competing products, and the prices at which

competitors would sell them. 120 F. Supp. 3d at 1119-20. The resulting estimate therefore did "not permit the court to calculate the true market price" absent the challenged representations. *Id.* at 1122. So too here: Dr. Ben-Akiva proposes to estimate how an alternative label might alter demand but does not plan to analyze how Sazerac, retailers, or competing sellers would respond in the resulting but-for market. *See* 2-ER-289 ¶ 51; 2-SER-21-22 ¶ 30.

Plaintiffs similarly assert (AB 30-31) that *GM* is distinguishable because it involved "latent safety defects in automobiles." That factual distinction has no bearing on the governing economic principle. In *GM*, Judge Furman ruled that a conjoint analysis measuring only consumers' valuations does not establish market value because market value depends on both willingness to pay and willingness to sell. 407 F. Supp. 3d at 234-39. In doing so, *GM* expressly relied on this Court's holding from *Zakaria* that "plaintiffs can measure class-wide damages using methods that evaluate what a consumer would have been willing to pay for the product had it been labeled accurately" so long as those methods "reflect supply-side considerations and marketplace realities that would affect product pricing." *GM*, 407 F. Supp. 3d at 237 (quoting

*Zakaria*, 755 F. App'x at 624).[6]

These cases correctly recognize that a price premium is a difference in market prices, not merely a difference in consumer willingness to pay. An expert who fails to analyze the supply side therefore cannot reliably measure the alleged price premium, and an opinion offered for that purpose is excludable under Rule 702. *See id.*; *Mier*, 2023 WL 4837851, at *1; *GM*, 407 F. Supp. 3d at 234-36; *NJOY*, 120 F. Supp. 3d at 1119-20.

Here, Plaintiffs repeat *Hadley*'s error in arguing (AB 33) that "the only way to measure the damages that each class member suffered is to model the damages based on the quantity of sales that actually—i.e., historically—took place." Historical sales volumes may be relevant at the final step, when an established per-unit price premium is multiplied across class-period purchases to calculate aggregate damages. *See In re General Motors LLC Ignition Switch Litig.*, 427 F. Supp. 3d 374, 394 (S.D.N.Y. 2019) ("*GM II*"). But historical sales volumes do not establish

[6] *GM* distinguished a "classic mislabeling case" in which actual market prices existed for the same product with two different labels. 407 F. Supp. 3d at 239. Such an analysis is not possible here because Fireball Malt with an alternative label does not exist.

that any price premium existed in the first place. *See id.* That threshold question requires determining the equilibrium price in the but-for market, which in turn requires a reliable analysis of how both demand and supply would have changed with a different label.

Nor, contrary to Plaintiffs' assertions (AB 33-34), is it necessary to use historical volumes in lieu of analyzing the but-for supply side to ensure adequate compensation for putative class members. Class damages would still be calculated from the number of units that class member actually purchased. But the per-unit premium must ***first*** be determined—by analyzing both demand and supply in the but-for condition—before being multiplied by historical sales to determine total damages. *See GM II,* 427 F. Supp. 3d at 394.

Plaintiffs' final argument—that Sazerac's pricing is somehow irrelevant because retailers, not Sazerac, determine actual retail prices. (AB 35)—is without merit. Although Sazerac does not set final retail prices, its prices to distributors, of course, influence the prices that consumers ultimately see. 3-ER-402-03 ¶ 103. Additionally, Sazerac's evidence establishes that it would maintain Fireball Malt's suggested retail price and its line-pricing policy even if demand fell. 3-ER-473-74

¶¶ 5-10. That evidence contradicts Dr. Ben-Akiva's unexplained assumption that any decline in demand would be absorbed through a lower market-clearing price while historical quantity remained fixed. And if Sazerac would not lower prices even with a revised label—given its business model and line-pricing policy—any "price premium" arising from retailer pricing could not, without further investigation, be attributed to the product label.

## CONCLUSION

The Court should reverse the certification order and remand with instructions that the case proceed only on the named Plaintiffs' individual claims.

Respectfully submitted this 2nd day of September, 2026.

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

*/s/ John Bash*
John Bash
300 W. 6th Street
Austin, TX 78701
Telephone: (737) 667-6100

Daniel Lombard
191 N. Wacker Dr. #2700
Chicago, IL 60656
Telephone: (737) 667-6100

Dylan C. Bonfigli
865 S. Figueroa St., 10th Fl.
Los Angeles, California 90017
Telephone: (213) 443-3000

DORSEY & WHITNEY LLP
Creighton R. Magid
1401 New York Avenue, NW
Suite 900
Washington, DC 20005
Telephone: (202) 442-3555

*Attorneys for Defendant-Appellant*
*Sazerac Company, Inc.*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Circuit Rule 32-1(b) because this brief contains 6,233 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure.

2. This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word.

3. I further certify that the electronic copy of this brief filed with the Court is or will be identical in all respects except the signature to the hard copy filed with the Court (if requested), and that the electronic version is free of viruses or malicious software.

Dated this 2nd day of September, 2026.

*/s/ Dylan C. Bonfigli*
Dylan C. Bonfigli

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on September 2, 2026. I certify that all participants in the case were served with a copy of the sealed Appellant's Reply Brief via email pursuant to 9th Cir. R. 27-13(c). I further certify that all participants in the case were served with a copy of the redacted Appellant's Reply Brief via the CM/ECF system.

*/s/ Dylan C. Bonfigli*

Dylan C. Bonfigli