**Case No. 25-4833**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

TERRY MYERS AND DAWN OUTLAW,

*Plaintiffs-Appellees,*

-v.-

SAZERAC COMPANY, INC.,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Northern District of California
No. 23-cv-00522-EMC
Honorable Edward M. Chen, presiding

# ANSWERING BRIEF FOR PLAINTIFFS-APPELLEES [REDACTED]

SETH A. SAFIER
RAJIV THAIRANI
GUTRIDE SAFIER LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

MATTHEW T. MCCRARY
GUTRIDE SAFIER LLP
4450 Arapahoe Ave., Suite 100
Boulder, CO 80303
Telephone: (214) 502-2171

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. ISSUES PRESENTED ..... 5

III. STATEMENT OF THE CASE ..... 6

A. Sazerac's Deceptive Marketing of Fireball Malt. ..... 6

B. Plaintiffs' Conjoint Damages Model. ..... 9

C. Judge Chen's Order Granting Class Certification. ..... 11

IV. STANDARDS OF REVIEW ..... 12

V. SUMMARY OF ARGUMENT ..... 13

VI. ARGUMENT ..... 14

A. Judge Chen Applied the Correct Legal Standard, Conducted a Rigorous Analysis, and Held that Plaintiffs' Damages Model Could Reliably Measure Classwide Damages. ..... 14

B. Judge Chen Did Not Abuse His Discretion In Determining that Sazerac's Criticisms of Dr. Ben Akiva's Conjoint Survey Go To Weight. ..... 18

1. The Proposed Survey Population is Reasonable and Appropriate. ..... 18

2. Even if Customers Desire Convenience, Dr. Ben-Akiva's Conjoint Survey is Admissible. ..... 23

3. Sazerac's Supply Side Objection Is Wrong. ..... 26

VII. CONCLUSION ..... 36

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. Sazerac Co.*, No. 23-cv-1060 (AS), 2025 U.S. Dist. LEXIS 397 (S.D.N.Y. Jan. 2, 2025) .................... 2

*Bailey v. Rite Aid Corp.,* 338 F.R.D. 390 (N.D. Cal. 2021) .................... 33

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014) .................... 13

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .................... 3, 6, 20, 38

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) .................... 2, 16

*Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311 (9th Cir. 1995) .................... 25

*Davidson v. Apple, Inc.*, 2018 U.S. Dist. LEXIS 137707 (N.D. Cal. May 8, 2018) .................... 33

*Favell v. Univ. of S. Cal.*, No. CV 23-846-GW-MARx, 2024 U.S. Dist. LEXIS 210436 (C.D. Cal. Nov. 13, 2024) .................... 34

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp. Inc.*, 326 F.R.D. 592 (N.D. Cal. 2018) .................... 32

*Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320 (5th Cir. 1996) .................... 23

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018) .................... passim

*In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326 (D.N.H. 2017) .................... 28

*In re GM LLC Ignition Switch Litig.,* 407 F. Supp. 3d 212 (S.D.N.Y. 2019) .................... 36

*In re MyFord Touch Consumer Litigation*, 291 F. Supp. 3d 936 (N.D. Cal. 2018) .................... 32, 38

*In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig.*, 695 F. Supp. 3d 1128 (C.D. Cal. 2023) .................... 34

*Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552 (N.D. Cal. 2020) .................... 33

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 2008 U.S. Dist. LEXIS 87625 (N.D. Cal. Oct. 16, 2008) .................... 24

*Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011 (9th Cir. 2024) .................... 13

*Maldonado v. Apple, Inc.*, No. 3:16-CV-04067-WHO, 2021 U.S. Dist. LEXIS 92483 (N.D. Cal. May 14, 2021) ........ 31, 33, 34, 39

*Meeker v. Meeker*, 2004 U.S. Dist. LEXIS 22708 (N.D. Cal. July 6, 2004) .......... 25

*NJOY Consumer Class Action Litig.,* 120 F. Supp. 3d 1050 (C.D. Cal. 2015) .......... 35

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022).......... 13, 14

*Pizzaro v. Sazerac Co.*, No. 23-CV-2751 (KMK), 2025 U.S. Dist. LEXIS 187959 (S.D.N.Y. Sep. 18, 2025) .......... 2

*Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015).......... 38, 40

*Pyramid Technologies, Inc. v. Hartford Casualty Insurance Co.*, 752 F.3d 807 (9th Cir. 2014) .......... 17

*Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996 (9th Cir. 2018).......... 14

*Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988 (S.D. Fla. 2016).......... 29

*Simpson Strong-Tie Co. v. MiTek Inc.*, 20-cv-06957-VKD (N.D. Cal. Jan. 9, 2023).......... 24

*Sonneveldt v. Mazda Motor of Am., Inc.*, No. 8:19-cv-01298-JLS-KES, 2022 U.S. Dist. LEXIS 219297 (C.D. Cal. Oct. 21, 2022).......... 33

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609 (9th Cir. 2016) .......... 24

*United States v. Hinkson*, 585 F.3d 1247 (9th Cir. 2009) .......... 4

*Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609 (9th Cir. 1989).......... 24

*Zakaria v. Gerber Prods. Co.*, No. LA CV15-00200 JAK (Ex), 2017 U.S. Dist. LEXIS 221124 (C.D. Cal. Aug. 9, 2017), aff'd, 755 F. App'x 623 (9th Cir. 2018).......... 29

**Rules**

Fed. R. Civ. P. 23 .......................................................................... passim
Fed. R. Civ. P. 23(b)(3) ........................................................................ 14
Fed. R. Evid. 702 .......................................................................... passim

## I. INTRODUCTION

In a meticulous 41-page order, Judge Chen certified a class of California purchasers of Fireball Malt, a product Plaintiffs allege was deliberately designed to resemble Sazerac's flagship Fireball Whisky product, despite containing no whisky and only half the alcohol content.




Certification was neither novel nor surprising. To the contrary, two other district judges have reached the same conclusion and certified classes challenging Sazerac's sale of Fireball Malt and materially similar products. *Andrews v. Sazerac Co.*, No. 23-cv-1060 (AS), 2025 U.S. Dist. LEXIS 397,

at *2 (S.D.N.Y. Jan. 2, 2025) (granting certification of a class of New York purchasers of Southern Comfort Malt); *Pizzaro v. Sazerac Co.*, No. 23-CV-2751 (KMK), 2025 U.S. Dist. LEXIS 187959, at *2 (S.D.N.Y. Sep. 18, 2025) (granting certification of classes of New York purchasers of Fireball Malt and Parrot Bay Malt).

Sazerac's appeal relies on repeated misstatements of what Judge Chen's Certification Order actually says. Sazerac asserts that the district court certified the class without requiring Plaintiffs to establish that their proposed damages methodology was capable of "reliably calculat[ing] damages in a manner common to the class" pursuant to Rule 23 and that it failed to conduct the Rule 702 analysis required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–95 (1993). The Certification Order says precisely the opposite: holding that "Plaintiffs have provided a model for damages consistent with their theory of liability in the case and capable of assessing class-wide damages as required under [*Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)]." 1-ER-41.

Nor did Judge Chen abdicate his Rule 702 responsibilities or automatically dismiss Sazerac's objections as going to weight. Indeed, he devoted nearly half of his opinion to discussing the governing standards under *Daubert* and Rule 702 and applying the same authority that Sazerac asserts he

was required to. He expressly recognized that Plaintiffs bore the burden of establishing the admissibility and reliability of their methodology by a "preponderance of the evidence." 1-ER-7. He then conducted a rigorous, issue-by-issue analysis of Sazerac's Rule 702 objections before concluding that Dr. Ben-Akiva's methodological choices were sound. *See*, *e.g.*, 1-ER-23, 28 ("[I]t is reasonable to use this population;" "Conjoint surveys like Plaintiffs' present one have thus been deemed reliable").

Rather than grapple with these facts, Sazerac repeatedly attacks a version of the Certification Order that does not exist because it wishes for this Court to review the admissibility of Plaintiffs' damages methodology de novo. But appellate review does not provide a disappointed litigant a second bite at the apple to relitigate evidentiary questions that the district court carefully considered and resolved. Because Judge Chen applied the correct legal standard, this Court reviews his ruling only for an abuse of discretion. Thus, reversal is warranted only if the district court's decision was "(1) illogical, (2) implausible, or (3) without support . . . in the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). Sazerac does not even attempt to satisfy this demanding standard.

Indeed, under any standard of review, Sazerac's appeal fails. Its argument boils down to three methodological objections that Judge Chen correctly rejected:

First, Judge Chen correctly rejected Sazerac's objection that Dr. Ben-Akiva surveyed too broad a population because the survey was not restricted to purchasers of Fireball Malt. The district court correctly concluded that Sazerac's objection rested on its disputed factual premise that Malt and Whisky purchasers are mutually exclusive, whereas Plaintiffs' proposed survey population reasonably reflected their theory that consumers associate the two products.

Second, Judge Chen correctly rejected Sazerac's criticism that the conjoint survey failed to account for convenience. Again, the district court carefully considered that contention and found that the proposed choice sets reasonably replicated real-world purchasing conditions. At best, Sazerac's criticisms created issues for cross-examination, not grounds for exclusion.

Finally, Judge Chen correctly rejected Sazerac's familiar "supply-side" objection. Because Plaintiffs' model uses observed market prices and historical sales data, it adequately accounts for supply-side considerations under the approach consistently applied by courts in this Circuit. *Hadley v. Kellogg Sales Co.,* 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) (collecting

cases). Sazerac's contrary theory would instead assume away purchases that actually occurred, effectively requiring Plaintiffs to calculate damages in a hypothetical world in which fewer class members were injured. That is not the relevant counterfactual, and it is why courts consistently reject this argument.

Ultimately, Sazerac identifies no legal error because there was none. It instead asks this Court to revisit the district court's resolution of competing expert opinions and methodological disputes under the guise of legal error. That invitation should be declined. For these reasons, the certification order should be affirmed.

## II. ISSUES PRESENTED

1. Whether the district court committed legal error where it expressly applied amended Rule 702, found by a preponderance of the evidence that Plaintiffs' proposed damages methodology was sufficiently reliable to be admitted, and concluded that Plaintiffs' proposed damages methodology was consistent with their theory of liability and capable of measuring damages on a classwide basis under *Comcast*.

2. Whether the district court abused its discretion in concluding that Sazerac's criticisms of Plaintiffs' proposed survey and damages methodology presented disputes affecting the weight of the evidence, rather

than grounds for rejecting the methodology under Rule 702.

## III. STATEMENT OF THE CASE

### A. Sazerac's Deceptive Marketing of Fireball Malt.

Appellant Sazerac Company, Inc. ("Sazerac") is the largest manufacturer of distilled spirits in the United States by volume. 1-ER-3. Among its portfolio is Fireball Whisky, the second best-selling distilled spirit in the country and one of Sazerac's most profitable products. *Id.*

In 2017, Sazerac's internal market research showed that consumer demand for distilled spirits was increasing, but the company was losing sales to beer and wine in convenience and grocery stores where distilled spirits could not legally be sold. To capture that market, Sazerac introduced Fireball Malt—a malt beverage designed to closely replicate the flavor profile of Fireball Whisky while using a malt alcohol base and containing only half the alcohol by volume ("ABV") of Fireball Whisky. *See* 1-ER-3–4.

Plaintiffs allege that Sazerac deliberately designed Fireball Malt to deceive consumers into believing they were purchasing Fireball Whisky in stores without liquor licenses. 1-ER-4. Sazerac accomplished this by making Fireball Malt's labeling, bottle shape, and overall packaging virtually indistinguishable from Fireball Whisky. *See* 1-ER-4. The bottles are shown below:













1-ER-4. These are not mere allegations. Plaintiffs adduced voluminous evidence that just about everyone was confused by the trickery, including Sazerac's own employees and third-party distribution partners. Individual executives within Sazerac loudly voiced concern over the Fireball Malt and

Whisky labels' similarity, and its likelihood of confusing consumers, prior to its rollout in different markets across the country.

[redacted]

Journalists nationwide similarly explained their surprise and confusion at finding Fireball at convenience stores in places like New York. *See, e.g.,* Steve King, *Wait, Can You Buy Fireball at Gas Stations and Grocery Stores Now?*, Q105.7, https://q1057.com/wait-can-%20you-buy-fireball-at-gas-stations-and-grocery-stores-now/ (last visited Nov. 7, 2024). The writer says that they "stopped for gas at [their] local convenience store" and were surprised by "little bottles of Fireball" at the checkout counter. 1-ER-5. When they asked the cashier "You carry Fireball now?" the cashier reportedly answered, "Yeah, I guess." *Id.*

[redacted]

**B. Plaintiffs' Conjoint Damages Model.**

At class certification, Plaintiffs submitted the expert opinion of MIT professor Dr. Moshe Ben-Akiva, who concluded that damages could be reliably measured on a classwide basis and proposed a methodology for calculating the price premium attributable to consumers' mistaken belief that Fireball Malt was Fireball Whisky. 2-ER-272–73.

Dr. Ben-Akiva teaches *Discrete Choice Analysis: Predicting Individual Behavior and Market Demand*, a course for graduate students and professionals that prepares them to apply discrete choice modeling, including conjoint analysis, to various fields, including the consumer-packaged goods space. 2-ER-270 ¶ 1. Additionally, Dr. Ben-Akiva has consulting experience across industries such as packaged goods, energy, telecommunications, and financial services, where he has applied market research and choice-based conjoint methodologies to real-world scenarios. 2-ER-270–71 ¶ 3. His academic work includes nearly 400 publications concerning discrete choice modeling, survey design, and market research, including *Foundations of Stated Preference Elicitation: Consumer Behavior*

*and Choice-Based Conjoint Analysis* (2019), co-authored with Nobel laureate Daniel McFadden.[1] 2-ER-295.

Dr. Ben-Akiva proposes to measure classwide damages using a choice-based conjoint survey, a well-established methodology that estimates the economic value consumers place on individual product attributes by requiring respondents to make repeated purchasing choices among competing products. 2-ER-283–90 ¶¶ 37–54. His survey first screens respondents to include only consumers over the age of 21 who have purchased a Fireball product in the last year. 2-ER-283–86 ¶¶ 37–40. Respondents then complete a series of choice tasks in which they select among alcoholic beverages whose attributes—including brand, product name, package size, alcohol type, ABV, and price—are systematically varied. 2-ER-286–88 ¶¶ 42–49. The survey responses are then analyzed using Hierarchical Bayes estimation and market-simulation techniques to estimate the value consumers assign to each attribute. 2-ER-290 ¶ 53. Dr. Ben-Akiva then combines those demand-side estimates with observed historical prices and unit sales in market simulations to estimate the price

[1] Though Sazerac asserts in its background section that "Dr. Ben-Akiva has no experience designing or implementing conjoint surveys pertaining to consumer products" (Opening Br. 7), that assertion is false. In any event, Sazerac does not challenge the district court's determination that Dr. Ben-Akiva was qualified to offer his opinions, nor could it reasonably do so.

premium attributable to the challenged misrepresentation under actual market conditions. 2-SER-21 ¶ 29.

By holding all other product attributes constant while varying the challenged attributes, Dr. Ben-Akiva's methodology isolates the portion of the purchase price attributable to consumers' mistaken belief that Fireball Malt is Fireball Whisky. *Id.* ¶ 54. The resulting price premium is expressed as either a percentage or dollar amount of the purchase price attributable to the alleged misrepresentation, thereby measuring damages in a manner consistent with Plaintiffs' theory of liability. *Id.* ¶ 54–56.

### C. Judge Chen's Order Granting Class Certification.

Following extensive briefing, competing expert reports, and a hearing, the district court issued a thorough order certifying the class. 1-ER-2–42. The district court first set forth the applicable legal standards under Rule 23 and amended Rule 702. 1-ER-6–10. It found that Dr. Ben-Akiva was qualified to offer his opinions and, after considering each of Sazerac's methodological challenges, concluded that Plaintiffs had established the reliability of their proposed methodology by a "preponderance of the evidence." 1-ER-7. The district court rejected each of Sazerac's methodological objections as going to weight rather than admissibility and held that Plaintiffs "provided a model for

damages consistent with their theory of liability in the case and capable of assessing class-wide damages as required under *Comcast*." 1-ER-41.

## IV. STANDARDS OF REVIEW

A district court's "decision to certify a class and any particular underlying Rule 23 determination involving a discretionary determination" is reviewed for "an abuse of discretion." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663 (9th Cir. 2022) (cleaned up)). "[T]he district court's determination of underlying legal questions" is reviewed "de novo." *Id.* (quoting *Olean*, 31 F.4th at 663). "[E]videntiary rulings" are reviewed "for an abuse of discretion." *Id.* (citing *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014)). "[F]actual findings underlying a class certification" order are reviewed for "clear error." *Id.* (quoting *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018)). "[T]he question of whether an expert's damages model 'is capable of showing class-wide impact, thus satisfying one of the prerequisites of Rule 23(b)(3) of the Federal Rules of Civil Procedure,'" is reviewed for an "abuse of discretion." *Id.* (quoting *Olean,* 31 F.4th at 663).

"A district court applying the correct legal standard abuses its discretion only if it (1) relies on an improper factor, (2) omits a substantial factor, or (3)

commits a clear error of judgment in weighing the correct mix of factors." *Id.* (quoting *Sali*, 909 F.3d at 1002 (cleaned up)).

## V. SUMMARY OF ARGUMENT

Sazerac correctly identifies the governing legal standards under Rule 23, amended Rule 702, and *Comcast*, but incorrectly asserts that the district court failed to apply them. Judge Chen expressly recognized Plaintiffs' burden to establish the reliability of their proposed damages methodology by a "preponderance of the evidence," conducted a rigorous Rule 702 analysis, and concluded that Plaintiffs had presented a damages methodology consistent with their theory of liability and capable of measuring classwide damages as required by *Comcast*. 1-ER-41. Sazerac's contrary argument depends on isolated statements taken out of context.

Once Sazerac's premise is rejected, the entire appeal is governed by abuse-of-discretion review. The district court carefully considered each of Sazerac's methodological objections—including challenges to the proposed survey population, the treatment of convenience, and Sazerac's supply-side criticisms, and reasonably concluded that none rendered Plaintiffs' proposed methodology unreliable under Rule 702. Rather than identify any fundamental defect in conjoint analysis itself, Sazerac simply argues that Dr. Ben-Akiva should have made different methodological choices. That is a dispute over the

weight of the evidence, not the existence of a reliable method for measuring classwide damages, and it provides no basis to overturn the certification order.

# VI. ARGUMENT

## A. Judge Chen Applied the Correct Legal Standard, Conducted a Rigorous Analysis, and Held that Plaintiffs' Damages Model Could Reliably Measure Classwide Damages.

Sazerac's opening brief rests on a fundamental mischaracterization of Judge Chen's certification order. Sazerac asserts that the district court "disavowed any need to analyze Dr. Ben-Akiva's methodology pursuant to Rule 702" (Opening Br. 18), "failed to act as a gatekeeper" (*id.* at 20), and certified the class "without requiring Plaintiffs to prove, by a preponderance of the evidence, that Dr. Ben-Akiva's proposed methodology was capable of 'reliably calculat[ing] damages in a manner common to the class at trial'" (*id.* at 16). The Certification Order says precisely the opposite.

Judge Chen devoted four pages to explaining the governing legal standards under Rule 702 and *Daubert*. 1-ER-06-10. He expressly recognized his role as gatekeeper and that "the court must find the elements of Rule 702 are met by a preponderance of the evidence." 1-ER-6–9.

Sazerac attacks a strawman by arguing that "simply dismissing" an argument as "going to the weight, not admissibility, of [the expert's] testimony is not a reliability determination." Opening Br. at 19. But Judge

Chen did exactly what Sazerac claims he failed to do. Rather than accepting Dr. Ben-Akiva's opinions at face value, he devoted approximately fifteen pages to evaluating the reliability of Plaintiffs' proposed methodology under Rule 702 before denying Sazerac's motion to exclude. 1-ER-13-29.

Judge Chen did not "simply dismiss" Sazerac's criticisms. He separately considered each of Sazerac's methodological objections, including criticisms that Sazerac reasserts in this appeal regarding (1) the proposed survey population, (2) the alleged failure to account for convenience, and (3) Sazerac's supply-side criticisms. In each instance, after carefully analyzing the objection, Judge Chen concluded that Sazerac's criticisms amounted to differences of opinion and not true defects of reliability. Among other findings, he held that it was "reasonable to use [Plaintiffs' proposed conjoint survey] population" (1-ER-23) and that conjoint surveys such as Plaintiffs' "have . . . been deemed reliable" (1-ER-28). And because Judge Chen expressly recognized that Rule 702 required Plaintiffs to establish admissibility by a "preponderance of the evidence" when stating the legal standard he was applying, those determinations necessarily reflect his conclusion that Plaintiffs satisfied that burden. 1-ER-7.

Those reliability determinations informed Judge Chen's conclusions that Sazerac's remaining criticisms went to the weight, rather than the

admissibility, of the evidence. That is entirely consistent with Ninth Circuit precedent. *See Pyramid Technologies, Inc. v. Hartford Casualty Insurance Co.*, 752 F.3d 807, 814 (9th Cir. 2014) ("Upon establishing that expert testimony is admissible, challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge."). Sazerac repeatedly quotes Judge Chen's discussion of weight while omitting the affirmative determinations he made regarding Plaintiffs' damages model.

Judge Chen likewise applied *Lytle*, quoting and applying the very language Sazerac now claims he failed to apply. Specifically, he held that "predominance is satisfied if plaintiffs can demonstrate that the model will be able to reliably calculate damages 'in a manner common to the class at trial.'" 1-ER-39. He concluded the predominance analysis by holding that "Plaintiffs have provided a model for damages consistent with their theory of liability in the case and capable of assessing class-wide damages as required under Comcast." 1-ER-41. In other words, Judge Chen expressly found that Plaintiffs had presented a reliable classwide damages model. Sazerac never meaningfully engages with those findings.

Sazerac's only argument depends almost entirely on two isolated statements from the Certification Order, divorced from the analysis the district court actually conducted. Opening Br. at 17. Properly read, those statements

simply emphasize the common nature of the damages issue. The district court did not suggest that a class could be certified without a reliable damages methodology. Nor do those statements undermine the detailed Rule 702 and Comcast analysis the district court conducted before denying Sazerac's evidentiary objections. Moreover, the district court's repeated use of the phrase "even if" confirms that it was discussing a hypothetical alternative scenario—not the actual basis on which it certified the class.

Had Judge Chen actually refused to perform the Rule 702 analysis required by *Daubert*, amended Rule 702, and *Lytle*, that would present a legal error warranting de novo review. But he did the opposite. He expressly applied the governing standard, rigorously evaluated each of Sazerac's methodological objections, and concluded that Plaintiffs' damages model was reliable. At that point, the only remaining question is whether Judge Chen abused his discretion in reaching those determinations. Sazerac never attempts to make that showing. It does not argue that Judge Chen's analysis was illogical, implausible, or unsupported by the record. Instead, it simply reasserts the same methodological criticisms that Judge Chen carefully considered and rejected. That disagreement does not reflect an abuse of discretion.

## B. Judge Chen Did Not Abuse His Discretion In Determining that Sazerac's Criticisms of Dr. Ben Akiva's Conjoint Survey Go To Weight.

[redacted]

### 1. The Proposed Survey Population is Reasonable and Appropriate.

Sazerac's first methodological objection concerns Dr. Ben-Akiva's proposed survey population, which consists of consumers over the age of 21 who have purchased a Fireball product in the last year (i.e., *either* the Malt or Whisky products). 1-ER-21.

The district court thoroughly analyzed the survey methodology and correctly found that Dr. Ben-Akiva's "target population" was reasonable and corresponds to Plaintiffs' theory of the case, which "is predicated on the

association that consumers make between the Malt and the Whisky at the time of purchase" and that accounting for brand loyalty "increase[ed] the accuracy of the target population." *Id.* Ultimately, the district court concluded that it "is reasonable to use this population . . . even if it can be argued that [it] may be broader in some ways than those who purchase Whiskey and/or Malt." *Id.* Not only were these determinations correct, they are precisely the reliability findings Sazerac claims the district court failed to make. Rather than merely rejecting Sazerac's criticisms, Judge Chen affirmatively concluded that Dr. Ben-Akiva's proposed survey population was reasonable.

Sazerac's criticism rests on a mistaken premise. It conflates the class definition with the appropriate survey population. The class definition establishes who may recover damages. A conjoint survey, by contrast, identifies the population whose preferences determine demand for the product. Those populations need not be identical. Demand is determined by potential purchasers in the relevant market, not merely consumers who ultimately purchased the product.

Sazerac relies on its own expert to argue that Malt and Whisky Fireball purchasers are mutually exclusive, and that, therefore, "almost none of the [survey] respondents [who purchased Whisky] will be actual or prospective purchasers of malt-based Fireball." Sazerac's argument that Fireball Whisky

purchasers are not prospective purchasers of the Products strains credulity. Fireball Malt was deliberately designed to mimic the appearance, flavor, and branding of Fireball Whisky—an existing product. It is therefore implausible to suggest that Fireball Whisky purchasers were not among the intended audience for the product. To the contrary, consumers familiar with Fireball Whisky were precisely the consumers most likely to recognize the Fireball brand, associate it with the taste profile they expected, and purchase the Products. This was confirmed by Sazerac's own documents which explained that the intended consumers of Fireball Malt are, "***consumers wanting to purchase Fireball Cinnamon Whisky*** in a wider variety of convenient shopping locations, including stores that can only sell beer, malt beverages, and wine products." 1-SER-3 (emphasis added). A survey population that includes Fireball Whisky purchasers therefore reflects, rather than distorts, the market Sazerac sought to reach.

Thus, the district court accurately determined that Sazerac's "mutual exclusivity" premise was disputed. 1-ER-22 ("It is not undisputed, as Sazerac contends, that malt and whiskey drinkers are mutually exclusive.").[2] It then

[2] Indeed, Sazerac's contention is particularly dubious given the voluminous, above-described evidence *from its own documents* of consumers complaining that they bought the Malt Product mistakenly believing it to be the Whisky Product.

properly found, in accordance with this Court's guidance, that it is not tasked with resolving the dispute at class certification, explaining that if the methodology "is otherwise reliable, the expert's testimony should not be excluded simply because their opinion is based on facts which are in dispute, unless the factual assumptions are 'indisputably wrong.'" 1-ER-8 (quoting *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)). Accordingly, the district court concluded that the survey "is not excluded simply because [Dr. Ben-Akiva's] assumption differs from that of Sazerac's." 1-ER-22.

Ultimately, Sazerac's objection did not demonstrate that conjoint analysis is incapable of reliably measuring damages or that no appropriate survey population exists. It contends only that Plaintiffs should have selected a different survey population. That is a disagreement over the application of an accepted methodology; not evidence that the methodology itself is unreliable. That is why courts in this Circuit routinely determine that objections regarding the correct survey population go to weight. *See Simpson Strong-Tie Co. v. MiTek Inc.*, 20-cv-06957-VKD, 2023 U.S. Dist. LEXIS 3856, at *9 (N.D. Cal. Jan. 9, 2023) ("Even if a survey does not select the optimal universe, the results are often still probative of the proposition the survey was intended to test." (citing *Vision Sports, Inc. v. Melville Corp.,* 888

F.2d 609, 615 (9th Cir. 1989))); *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc*., 648 F. App'x 609, 612 (9th Cir. 2016) ("Although the district court faulted the survey's biased questions and unrepresentative sample, neither defect was so serious as to preclude the survey's admissibility"); *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co*., 2008 U.S. Dist. LEXIS 87625, at *25 (N.D. Cal. Oct. 16, 2008) (objections to scope of survey universe did not make the survey inadmissible); *Meeker v. Meeker*, 2004 U.S. Dist. LEXIS 22708, at *34–35 (N.D. Cal. July 6, 2004) (finding that an objection that the "population surveyed was overly-inclusive" went to weight not admissibility). Thus, the district court properly determined that Sazerac's objection, "goes to the merits of the survey, and not the admissibility of it." 1-ER-22. Even if Sazerac's expert believed that a better survey could be conducted with a different survey population, "the *Daubert* inquiry does not ask whether the survey is the 'best,' but rather whether it offers a sound method." *Id.* (*citing Daubert v. Merrell Dow Pharms., Inc*., 43 F.3d 1311, 1318 (9th Cir. 1995) ("[T]he test under *Daubert* is not the correctness of the expert's conclusions, but the soundness of his methodology.")).

**2.** [redacted]

[redacted]

First, this argument misstates Plaintiffs' methodology. As Dr. Ben-Akiva explained, his "experiment will value the 'Convenience' factor by taking into account how consumers' preferences change in various settings." 2-ER-276 ¶ 23. He explained that he proposes designing choice sets "to represent the types of alternatives that a consumer is likely to see at a particular type of store. Certain choice sets will represent the non-liquor store settings (i.e., convenience stores, grocery stores, drugstores); distilled spirits alternatives such as Fireball Cinnamon Whisky will not be included in these, since such products cannot legally be sold in these retail establishments. Other choice sets will be designed to represent liquor store settings, in which Fireball Cinnamon malt beverage legally can be sold, but where it often is not carried." 2-ER-287–88 ¶ 45. By comparing respondents' choices across these distinct retail settings, the conjoint analysis measures how consumers' preferences change depending on where they are shopping.

Further, Sazerac's contention that convenience is the most important purchase driver for the products is implausible. Consumers purchasing an

alcoholic beverage necessarily care about the identity of the product they are buying—including whether it is whisky or a malt beverage and its alcohol content. Convenience may affect where a consumer shops, but it does not displace the consumer's interest in obtaining the product that was represented. A consumer may pay for the convenience of purchasing Fireball Whisky at a nearby store, but that does not mean the consumer places greater value on convenience than on whether the product is, in fact, Fireball Whisky rather than a materially different malt beverage.

Sazerac also mischaracterizes Plaintiff Terry Myers's testimony. Opening Br. at 28. That testimony simply reflects a willingness to pay for the convenience of obtaining the product he intended to purchase at a more convenient location. It says nothing about his willingness to purchase an entirely different product with a different alcohol base and substantially lower alcohol content.

Ultimately, Sazerac's convenience argument amounts to a disagreement with the district court's application of Rule 702 to the facts of this case, not a claim that the district court applied the wrong legal standard. The district court thoroughly analyzed why Plaintiffs' survey did not need to single out convenience to be reliable, including that the Malt and the Whisky would not be simulated as appearing in the same store together; that the

attributes in the choice sets will also reflect "real-world" conditions, such as brand names, product names as shown on actual labels, sizes of bottles in milliliters, ABV, alcohol type and price; and that the choice sets will also be designed to "represent the types of beverages consumers would see in a particular type of store, thus, a choice set designed to resemble a gas station will not include spirits." 1-ER-24–25. That is precisely the type of case-specific reliability determination committed to the district court's discretion.

Finally, even if Sazerac were correct that convenience should be incorporated differently into the conjoint analysis, that would not establish that Plaintiffs' methodology is unreliable under Rule 702. As Judge Chen correctly held, courts have repeatedly held that disagreements over which attributes or variables should be included in a conjoint survey concern the design of the experiment and go to the weight of the expert's testimony, not its admissibility. *See In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 332–33 (D.N.H. 2017) ("Dial also argues, plausibly, that by limiting the attributes surveyed to four (five, including price), Boedeker's model fails to adequately take into account and properly weigh other attributes that may well be very important to liquid hand soap consumers (*e.g.*, brand name, or scent, or shape or color of the product). However, . . . those issues—and the myriad others identified by Dial—are either curable, or go to the

weight, not admissibility, of Boedeker's testimony."); *Zakaria v. Gerber Prods. Co.*, No. LA CV15-00200 JAK (Ex), 2017 U.S. Dist. LEXIS 221124, at *36 (C.D. Cal. Aug. 9, 2017) (similar), aff'd, 755 F. App'x 623 (9th Cir. 2018); *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 995 (S.D. Fla. 2016) (similar).

At most, Sazerac contends that the conjoint experiment should measure convenience differently. That is a competing modeling choice—not evidence that conjoint analysis is incapable of measuring classwide damages.

### 3. Sazerac's Supply Side Objection Is Wrong.

Sazerac also argues that the district court should have excluded Dr. Ben-Akiva's conjoint analysis because it allegedly failed to account for "supply-side factors" and therefore measured only consumers' willingness to pay rather than a market price premium. Opening Br. at 31–39. The district court thoroughly considered and correctly rejected that contention. 1-ER-25–28. After applying the proper Rule 702 framework, it found that Dr. Ben-Akiva's methodology adequately accounted for the relevant supply-side considerations and was capable of measuring a market price premium on a classwide basis, not merely consumers' abstract willingness to pay. *Id.*

But as Judge Chen held, "conjoint analyses can adequately account for supply-side factors and can accurately estimate the price premium resulting

from misrepresentations without violating the tenets of *Comcast* if two conditions are met." 1-ER-26. First, the survey must use prices that are representative of the actual market prices that "prevailed during the class period." *Id.* (quoting *Hadley*, 324 F. Supp. 3d at 1105). Second, the statistical calculations must assume the actual quantities of products sold during the class period. *Id.* (citing *Hadley*, 324 F. Supp. 3d at 1105). Those conditions ensure that the conjoint model measures the historical market price premium consumers paid in the marketplace—not a hypothetical willingness to pay divorced from market realities. This rationale is well supported.

As Judge Koh explained in *Hadley*, market prices are a result of "a combination of market demand and market supply." 324 F. Supp. 3d at 1104. If a conjoint survey lacks *any* consideration of supply side factors, then it measures only a shift in "demand-side willingness-to-pay" as a result of a label change, but not a market price premium. *Id.* at 1105 (emphasis added). By incorporating historical prices and historical quantities sold into the market simulator, however, a conjoint analysis compares how a shift in the demand curve intersects with the real-word supply curve, which necessarily included the relevant supply side costs of production, storage, distribution, etc. *Id.* The result is the "highest price in the actual market at which [the defendant] could have sold the same number of products without the challenged [statement]"—

i.e., the market price premium attributable solely to the defendant's misleading label. *Id.* For *Daubert* and *Comcast* purposes, "the fundamental issue is this: does such an analysis reliably (as required by *Daubert*) reflect a product's 'reasonable market value' (as required by the law)." *Maldonado*, 2021 U.S. Dist. LEXIS 92483, at *70 (citations omitted). "Real-world price and quantity data is reliable for these purposes because, put simply, it is what the supplier firm actually did. The new price that emerges—and the resulting price premium—reliably captures what it set out to capture: a change in price as a result of a change in consumer behavior." *Id.*

Nearly every district court in this Circuit that has considered this argument has come to the same conclusion. *E.g.*, *Fitzhenry-Russell v. Dr. Pepper Snapple Grp. Inc.*, 326 F.R.D. 592, 606 (N.D. Cal. 2018) (rejecting supply-side challenge where conjoint survey used "market clearing prices as the basis for the prices in their survey" and "took into account the fixed quantity of supply of Canada Dry because those sales occurred in the past"); *In re MyFord Touch Consumer Litigation*, 291 F. Supp. 3d 936, 969–70 (N.D. Cal. 2018) (similar); *Davidson v. Apple, Inc.*, 2018 U.S. Dist. LEXIS 137707, at *22 (N.D. Cal. May 8, 2018) (similar); *Hadley.*, 324 F. Supp. 3d at 1115 (similar); *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 576 (N.D. Cal. 2020) (similar); *Bailey v. Rite Aid Corp.,* 338 F.R.D. 390, 412 (N.D. Cal.

2021) (similar); *Maldonado*, No. 3:16-cv-04067-WHO, 2021 U.S. Dist. LEXIS 92483, at *69; *Sonneveldt v. Mazda Motor of Am., Inc*., No. 8:19-cv-01298-JLS-KES, 2022 U.S. Dist. LEXIS 219297, at *60-61 (C.D. Cal. Oct. 21, 2022) (similar).

At best, these courts have all held that the supply-side factor issue goes to weight not admissibility, and can therefore be raised to the jury. *See, e.g., Favell v. Univ. of S. Cal.*, No. CV 23-846-GW-MARx, 2024 U.S. Dist. LEXIS 210436, at *38-39 (C.D. Cal. Nov. 13, 2024) (stating "this Court agrees that the real-world and market realities evidence upon which USC relies speak to the weight of Dr. Dennis's analysis - which certainly could persuade a jury - but are not supportable reasons for excluding Dr. Dennis's expert report and testimony"); *In re Univ. of S. California Tuition & Fees COVID-19 Refund Litig*., 695 F. Supp. 3d 1128, 1149 (C.D. Cal. 2023) (similar); *Maldonado v. Apple, Inc*., No. 3:16-CV-04067-WHO, 2021 U.S. Dist. LEXIS 92483, at *22 (N.D. Cal. May 14, 2021) (similar).

Thus, contrary to Sazerac's assertion, Dr. Ben-Akiva did account for supply-side factors. 2-ER-290. In the section of his report addressing supply-side considerations, he explains that his methodology relies on historical market prices and historical unit sales to translate consumers' willingness to pay into a market-price premium. 2-ER-290. By anchoring the conjoint

analysis to the prices consumers actually paid and the quantities actually sold during the class period, Dr. Ben-Akiva accounts for the relevant supply-side considerations rather than measuring abstract willingness to pay. By intersecting the shift in the demand curve that his survey measures with the historic supply curve, the market simulator can estimate the historic price premium attributable to the Sazerac's deception and thus provide a measure of the damages owed to class members.

Further, as Judge Chen correctly recognized, Sazerac's reliance on *In re NJOY Consumer Class Action Litig.,* 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) is misplaced. 1-ER-25. There, the plaintiffs sought to measure consumers' willingness to pay for a hypothetical product that had never existed in the marketplace. *Id.* Here, by contrast, Dr. Ben-Akiva estimates the price premium attributable to the challenged misrepresentation using historical market prices and historical sales volumes. As *Hadley* and numerous other cases recognize, that methodology measures the market-price premium consumers actually paid rather than merely their subjective willingness to pay.

The same is true of *In re GM LLC Ignition Switch Litig.,* 407 F. Supp. 3d 212, 239 (S.D.N.Y. 2019). That case did not involve a conventional consumer false-advertising claim, but rather alleged omissions concerning

latent safety defects in automobiles for which the court concluded there was no observable but-for market. Critically, the court expressly acknowledged the substantial body of consumer false-advertising decisions approving conjoint analyses and recognized that, in those cases, experts "adequately account[ed] for supply-side factors" because "(1) the prices used in the surveys . . . reflect[ed] the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect[ed] the actual quantities of products sold during the class period." *Id.* at 238 (quoting *Hadley*, 324 F. Supp. 3d at 1105).

But Sazerac goes further, contending that even accounting for supply side factors is insufficient. Instead, according to Sazerac, a reliable damages methodology must also model how suppliers would have hypothetically responded to a change in demand in the but for world where the deception is absent. According to Sazerac, if fewer consumers would have purchased Fireball Malt absent the alleged deception, then it would have simply reduced its production and decreased supply to keep prices the same. Without modeling this hypothetical response, Sazerac argues, a conjoint survey cannot reliably measure a price premium. Nonsense.

Sazerac's supply-side modeling argument rests on a fundamental misunderstanding of Plaintiffs' methodology. A conjoint analysis isolates the

value consumers attributed to the challenged representation by holding all other product characteristics constant and removing only the alleged deception. It is not an academic exercise designed to model precisely how every aspect of the marketplace might have changed had Sazerac marketed the Product truthfully. Thus, Sazerac's assertion that it would not have lowered its wholesale price, MSRP, or continued selling the Product absent the alleged deception does not undermine Plaintiffs' methodology.

Moreover, as this Court has explained, the proper measure of damages in a consumer deception case is "the difference between what was paid and what a reasonable consumer would have paid at the time of purchase without the [deception]." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015). And in a class action, the model must measure damages "across the entire class." *Comcast*, 569 U.S. at 35. That class, in turn, actually purchased a certain number of real products all with Sazerac's deceptive labels on them. Thus, the only way to measure the damages that *each* class member suffered, is to model the damages based on the quantity of sales that actually—i.e., historically—took place. Modeling a scenario in which fewer sales took place excludes from the damages model class members who purchased the Products and paid full price for them. Such a model would necessarily not calculate the damages "across the entire class." A damages

model cannot account for the "entire class" if some of the class members are excluded from the analysis of the "but for" world. The only way to do so is by using the historical supply curve, not by trying to model a new one based on factors Sazerac only vaguely identifies. *See In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d at 969 ("[M]odifying the supply curve could mean that a projection will assume that fewer vehicles were sold than were in fact sold, thereby failing to account for the fixed number of defective vehicles that *were* sold. Assuming that fewer consumers were injured in the hypothetical world than were injured in the real world runs the risk of undercompensating the real-world injured consumers.").

Judge Orrick also noted the practical problems with the "more amorphous" modeling approach that Sazerac supports. *Maldonado* 2021 U.S. Dist. LEXIS 92483, at *70. He reasoned that:

> There is no set of considerations established to count as 'supply-side factors' because any factor affecting the supply-side of the equation qualifies. That neat label obscures a messy reality. Indeed, Apple never lays out precisely what Gaskin could do to adequately capture market value; it just says he did not do it. But *Daubert* is about reliability. It is about preventing bad science from going to juries and exerting undue influence under the aegis of expertise. Taking Apple's approach, experts would be required to perform a counterfactual analysis that disregards what happened in the real world and instead asks what hypothetically would have happened had demand changed. While finding a new equilibrium on a changed supply-and-demand graph in an Economics 101 class might not be that difficult, Apple would have these experts take into

> account the myriad, unspecified 'market realities' that can affect firms' sales and consumers' purchases. But because any number of factors can affect supply—and, for that matter, demand—experts would never know what new 'market reality' a party would throw at them as missing. There is a risk that these motions become less about the fundamental reliability of evidence and more about the creativity of the opponents of that evidence identifying factors that could influence markets. This all would undermine, not be a faithful application of, the purpose of *Daubert*.

*Id.* at *72–73. The same is true here.

Finally, both for purposes of restitution under California law and certification under Rule 23 it is axiomatic that damages calculations "need not be exact." *Id.* Indeed, "California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Pulaski*, 802 F.3d 979 at 989. Thus, Sazerac's insistence that the damages model try to account for every precise way in which the "but for" world might have been different is not supported by law.

Put differently, because the purpose is to estimate damages that occurred in the past, "the model is necessarily retrospective rather than prospective," and therefore it is appropriate to model the market price based on "sales transactions that have already occurred in fixed quantities during the class period." 1-ER-27. Those observed transactions already embody the interaction of supply and demand, including Sazerac's pricing decisions. That

is precisely why Dr. Ben-Akiva uses historical market prices and historical sales data to estimate the portion of the observed market price attributable to the challenged misrepresentation. As the district court correctly found, his model estimates a market-price premium by intersecting the measured change in the demand curve with the historical supply curve. 1-ER-27. That is not a simple willingness to pay, and is the best way to account for the supply side of the equation in estimating damages.

Finally, Sazerac's self-serving declaration that it would have maintained the same wholesale price is largely beside the point and does not alter this analysis. Consumers do not purchase Fireball Malt from Sazerac; they purchase it from independent retailers, who set the retail prices consumers actually pay. Sazerac's unilateral decision to maintain its wholesale price would not dictate the equilibrium retail price in the marketplace. Thus, its declaration regarding what it claims it would have done neither rebuts Plaintiffs' methodology nor establishes what the retail market price would have been in the but-for world. Dr. Ben-Akiva's methodology therefore properly focuses on the historical retail prices consumers actually paid and the historical quantities sold, rather than Sazerac's speculative assertion that it would have kept its wholesale price unchanged.

## VII. CONCLUSION

For the foregoing reasons, the Court should affirm the district court's order granting class certification.

Dated: July 13, 2026

Respectfully submitted,

*/s/Rajiv V. Thairani*

Seth A. Safier
Matthew T. McCrary
Rajiv V. Thairani
GUTRIDE SAFIER LLP
*Attorneys for Plaintiffs-Appellees*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-4833

I am the attorney or self-represented party.

**This brief contains** 7,565 **words,** including 472 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ________.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Rajiv V. Thairani **Date** 7/13/2026

*(use "s/[typed name]" to sign electronically-filed documents)*